352 F.2d 267
 FIRST NATIONAL BANK OF SMITHFIELD, NORTH CAROLINA, Appellee,
v.
James J. SAXON, Comptroller of the Currency of the United
States, Appellant.
FIRST NATIONAL BANK OF SMITHFIELD, NORTH CAROLINA, Appellee,
v.
FIRST NATIONAL BANK OF EASTERN NORTH CAROLINA, Appellant.
 Nos. 9795-9796.
 United States Court of Appeals Fourth Circuit.
 Argued April 7, 1965.
Decided Oct. 21, 1965.
 
 David L. Rose, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, and Robert H. Cowen, U.S. Atty., on the brief), for appellant in No. 9795.
 Carl V. Venters, Jacksonville, N.C., for appellant in No. 9796, and John R. Jordan, Jr., and Herbert L. Toms, Raleigh, N.C. (E. V. Wilkins, Smith-field, N.C., and F. T. Dupree, Jr., Raleigh, N.C., on the brief), for appellee.
 Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.
 ALBERT V. BRYAN, Circuit Judge:
 
 
 1
 The Comptroller of the Currency's approval of the establishment of a branch of a National bank[1] is ex facie invalid, the District Court has held, if it is issued by the Comptroller without a hearing conforming to the requirements of the Administrative Procedure Act.[2] In this view[3] we think the Court was mistaken. Throughout it must be remembered that we are not deciding whether it would be advisable or more equitable for the Comptroller to grant a hearing. We are deciding only that the law does not require it.
 
 
 2
 This is not to say that there may not be judicial review of the Comptroller's action. We hold, too, that the bank's competitors have standing to seek the review, not because of the potential sharpening of competition, but because they have an immediate concern, apart from the public generally, to prevent an approval contrary to law. Thus they are 'interested' within the purpose of 1004(b), APA.
 
 
 3
 The First National Bank of Eastern North Carolina applied to the Comptroller of the Currency on July 11, 1963 for authorization to establish a branch in the Town of Smithfield, North Carolina. The applicant has its principal office at New River, North Carolina and eleven branches in the east end of the State. In a field investigation made by the Comptroller preparatory to consideration of Eastern's request, an examiner called upon the First National Bank of Smithfield, North Carolina. Thereupon the latter sought and obtained a conference with the Comptroller's office, on August 5, 1963, where its representatives pressed objection to the advent of a new bank in town. Eastern was not present or heard at that time.
 
 
 4
 Approval was given the Eastern application by the Comptroller on August 19, 1963, without a formal statement of fact findings, conclusions of law or opinion. However, no certificate of authority then issued. The Bank of Smithfield brought this action on September 9, 1963 to have the Comptroller's determination declared illegal and its effectuation enjoined. The bank denied any need or necessity for Eastern's branch, predicted irreparable damage to follow from the permitted entry of another bank in the Town and averred that the approval was illegal because arbitrary, capricious and contravening the Comptroller's own regulations.
 
 
 5
 In limine the complaint charged the Comptroller's procedure violative of the Administrative Procedure Act and abridging the rights of the Smithfield Bank without Constitutional due process of law. More specifically in this regard, it alleged that the Comptroller's ruling was an adjudication under 1004, APA, which could not be made without notice and a full-dress hearing. This primary position the District Court upheld.
 
 
 6
 The Banking Act in pertinent part, 12 U.S.C. 36(c) (1964 Ed.),[4] provides:
 
 
 7
 '(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. * * *'
 
 
 8
 The North Carolina statute, to be read under the reference in the Banking Act, is G.S. 53-62. It permits the establishment of bank branches with the approval of the Commissioner of Banking which 'may be given or withheld (by him) in his discretion'. In this judgment he is required to consider stated relevant factors.
 
 
 9
 Assuming that the Comptroller is an 'agency', that the approval by the Comptroller is a 'license' and that the consideration by him of the application is an 'adjudication', all within the meaning of 1001, still no requirement is found in the APA of the hearing now claimed by the Bank of Smithfield. The provision on which appellee relies is 1004, but that section compels an agency hearing only when the 'adjudication (is) required by statute to be determined on the record after opportunity for an agency hearing,' and there is no such compulsion here.
 
 
 10
 The District Judge thought that the implication of the APA was to command an adversary hearing before the Comptroller. This inference, we think, is unwarranted. Not only is statutory foundation wanting for it, but the legislative history of the APA discloses that Congress expressly disavowed any intent that the Act demand a hearing except where already required by some other statute. See: Statement of the Chairman of the Drafting Subcommittee, 92 Cong.Rec. 5651, 5655; Sen.Rept. No. 752, 79th Cong., 1st Sess., pp. 6, 7, 16 (1945); H. Rept. No. 1980, 79th Cong., 2d Sess., pp. 10, 18, 26 (1946). For compilation see Sen.Doc. No. 298, 79th Cong., 2d Sess., pp. 192, 193, 202, 244, 252, 260, 359, 370 (1946).
 
 
 11
 Furthermore, the uniform administrative practice of the Comptroller for a hundred years has sanctioned his present course. True, his own regulations had permitted an adversary hearing, but resort to these rules was entirely at his option. 12 C.F.R. 4.8(d), (e) (1963). It is stipulated that when Eastern's application came before the Comptroller, these regulations were in suspense pending revision-- they had been rescinded on February 20, 1963, 12 C.F.R. Part 4 (Cum.Supp.1965), and were not republished until June 9, 1964, 12 C.F.R. 4.1 et seq. (Cum.Supp.1965). The practice in the Comptroller's office has not gone unquestioned, but it has never been disapproved. Northwest Bancorporation v. Board of Governors, 303 F.2d 832, 843 (8 Cir. 1962), citing Davis, Administrative Law Treatise, 4.04, pp. 247-248. This strongly argues its validity. Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (May 3, 1965); Paragon Jewel Coal Co. v. Commissioner, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (April 28, 1965).
 
 
 12
 Procedural due process is not offended by the Comptroller's practice. The absence of a hearing provision in the Banking Act raises no Constitutional question, for the omission was within the power of Congress. Bridgeport Fed. Sav. & Loan Ass'n v. Federal Home Loan Bank Bd., 307 F.2d 580, 581 (3 Cir. 1962), cert. den., 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499. However, all apprehension is dissipated by the APA's grant in 1009 of a review of the Comptroller's decision in the District Court to any party in interest. Lichter v. United States, 334 U.S. 742, 791, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); cf. Federal Communications Comm. v. WJR, 337 U.S. 265, 274, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949).
 
 
 13
 Abundant authority, with which we agree, holds that the Comptroller's determination in the present area is not immunized from review by the exemption in the preface of 1009, APA, reading, 'Except so far as * * * agency action is by law committed to agency discretion.' Any discretion vested in the Comptroller in passing upon applications for approval of bank branches is not the type of discretion to which action has been 'committed by law' but is rather one of the character expressly made reviewable by 1009(e)(1). 4 Davis, Administrative Law Treatise, 28.16; Community National Bank of Pontiac v. Saxon, 310 F.2d 224 (6 Cir. 1962); Whitney Nat. Bank v. Bank of New Orleans & Trust Co., 379 U.S. 411, 428, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965) (dissenting opinion of Justice Douglas); Commercial Security Bank v. Saxon, 236 F.Supp. 457 (D.D.C.1964).
 
 
 14
 Protestant, Smithfield Bank, also contends that the Comptroller's approval is contingent upon his compliance with the inquiries and ascertainments required of the State Commissioner of Banks by the North Carolina statute, G.S. 53-62 supra. It stipulates: that no branch shall be permitted save upon the approval of the Commissioner of Banks, which 'may be given or withheld by * * * (him) in his discretion'; that 'in exercising such discretion, (he) shall take into account, but not by way of limitation, such factors as the financial history and condition of the applicant bank, * * * its future earnings prospects, and the general character of its management'; and that the approval shall not be given until the Commissioner shall have 'ascertained to his satisfaction (i) that the establishment of such * * * will meet the needs and promote the convenience of the community to be served by the bank, and (ii) that the probable volume of business and reasonable public demand in such community are sufficient to assure and maintain the solvency of said branch * * * and of the existing bank or banks in said community'.
 
 
 15
 The Federal statute, the protestant continues in argument, incorporates all of these requirements and exacts analagous compliance with them by the Comptroller. For this contention reliance is placed upon the clause in 12 U.S.C. 36(c), supra, directing that the establishment of a National bank branch be 'subject to the restrictions as to location imposed by the law of the State on State banks'. We disagree with the argument. Assuming arguendo that the North Carolina statute does demand as a condition precedent to the approval of a branch, an ascertainment of need and convenience, with discretion in decision nevertheless always retained by the Commissioner, in our judgment this command has not been extended to the Comptroller by the National Banking Act.
 
 
 16
 That the phrase 'restrictions as to location' does not advert to economic factors of need and convenience, but refers exclusively to a geographical determination is quite plain from the legislative history of the Act. In Congress, debate on the bill which became the heart of the current Act, 12 U.S.C. 36(c), supra, was between advocates of unlimited National bank branching and those favoring its equation with the branch privileges of State banks. Generally the latter had been confined to the municipality of the parent bank, to immediately adjacent areas or to other territorial regions. By way of compromise the present clause was added with the intent of restricting National branches to the city-wide, county-wide or State-wide delimitation circumscribing the State banks. There was no other reason for the words 'subject to the restrictions as to location imposed by the law of the State on State banks.' H.Rept. 83, 69th Cong., 1st Sess., pp. 2, 4-7 (1926); 68 Cong.Rec. 5816; McFadden Act, 44 Stat. 1228; S.Rept. 584, 72d Cong., 1st Sess., pp. 1-6, 11; S.Rept. 77, 73d Cong., 1st Sess., pp. 11, 16-17; 77 Cong.Rec. 3726, 5896; Banking Act of 1933, 48 Stat. 189, 12 U.S.C. 36(c).
 
 
 17
 For the court review no evidential record need first be developed before the Comptroller. No such prerequisite is exacted by the APA; plainly it envisions instances where the evidence initially is to be taken in a suit reexamining the agency action. To this end the Act gives the court jurisdiction to 'hold unlawful and set aside agency action * * * found to be * * * unwarranted by the facts to the extent that the facts are subject to trial de novo * * *.' 1009(e)(6). Nothing in the statute precludes the court from discovering the facts for the first time.
 
 
 18
 The court will not be held to the substantial-evidence rule, that is it will not be limited to the ascertainment of whether, on the record as a whole, there is substantial evidential and factual support for the Comptroller's action. Cf. 4 Davis, Administrative Law Treatise, supra, 29.01; Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We have said the Comptroller did not act arbitrarily in not allowing a hearing. However, a necessary consequence of his unilateral procedure is that the facts on which the Comptroller presumably acted should not be given the preferred position accorded by the substantial-evidence rule. The rule would declare them indisputable if some reasonable basis for them may be found in the evidence. Applied here, the plaintiff would be bound by evidence offered in a proceeding in which it was not heard. Hence, there is no place in the review for an opening-presumption of correctness of any fact which it may appear to the Court was adopted by the Comptroller for his decision. This is the necessary and plain intent of the APA in 1009(e)(6) just quoted.
 
 
 19
 The Banking Act, 12 U.S.C. 36(c), in permitting bank branching 'with the approval of the Comptroller of the Currency' intended, we think, to allow the Comptroller to consider as a factor in his decision to grant or refuse approval, the public interest, need and necessity, and, subject to court review, to exercise his discretion in determining such interest, need or necessity. Apfel v. Mellon, 59 App.D.C. 94, 33 F.2d 805, 806, 807 (1929), cert. den., 280 U.S. 585, 50 S.Ct. 35, 74 L.Ed. 634 (1929).[5] On the remand of this case, the plaintiff may adduce evidence demonstrating the impermissibility of the Comptroller's approval of a branch bank at Smithfield. Testimony to the contrary will be receivable from the Comptroller. The Court will then find the facts. Thereon, it will judge de novo the validity, in fact and in law, of the Comptroller's final action.
 
 
 20
 The standards by which the Comptroller's action will be measured are, first, the criteria enumerated in the Banking Act, 12 U.S.C. 36(c) supra, viz: whether the establishment of the branch is 'authorized to State Banks' and the location conforms to the restriction of State laws. The capital requirements of the statute have, concededly, been met. If after the court has made its fact findings, it then appears that the decision of the Comptroller is dependent upon an exercise of discretion, the Court cannot substitute its discretion for the Comptroller's. However, it can set aside such a determination if, in the light of the facts found by the Court, it concludes that the Comptroller has abused, exceeded or arbitrarily applied his discretion. Mastrapasqua v. Shaughnessy, 180 F.2d 999, 1002 (2 Cir. 1950).
 
 
 21
 A competitor qua a competitor is not ineligible to seek the review. Admittedly, threat of competition is not ground for rejection of the application. Tennessee Electric Power Co. v. T.V.A., 306 U.S. 118, 139, 59 S.Ct. 366, 83 L.Ed. 543 (1939). Nevertheless a competitor has an obvious interest sufficient to warrant his insistence that no branch bank be established through procedures or upon grounds not acceptable under the permissive statutes. Alabama Power Co. v. Ickes, 302 U.S. 464, 484, 58 S.Ct. 300, 82 L.Ed. 374 (1938); Union Savings Bank of Patchogue v. Saxon, 118 U.S.App.D.C. 296, 335 F.2d 718 (1964); National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537, 544 (6 Cir. 1958), cert. den., 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69; North Arlington Nat. Bank v. Kearny Fed. Sav. & Loan Ass'n, 187 F.2d 564 (3 Cir. 1951), cert. den., 342 U.S. 816, 72 S.Ct. 30, 96 L.Ed. 617.
 
 
 22
 With the Smithfield Bank we think the Comptroller is obliged to 'state and currently publish in the Federal Register' the 'general course and method by which (his) functions are channeled and determined' and 'publish' or 'make available to public inspection all final opinions or orders in the adjudication of cases' (except when confidential) and 'all rules', as directed by the APA, 1002. This requirement applies to 'every agency'. Save for the temporary suspension, already mentioned during which the approval in suit was sought and obtained, the Comptroller apparently did promulgate and publish advices of his procedures. No complaint can be made that word of his intention to grant the approval did not seasonably reach the Smithfield Bank.
 
 
 23
 The intermission of the rules and regulations did not flaw the Comptroller's actions during that period, for the only penalty of the statute for the omission is to excuse compliance by outsiders with the requisite procedure. Furthermore, in view of our conclusion that the Smithfield Bank was not, in any event, entitled to a formal hearing before the Comptroller, the temporary absence of an outline of the procedure before him could not have prejudiced the bank.
 
 
 24
 The District Court overturned the Comptroller's approval solely because of the absence of an APA hearing before him; it did not resolve the merits of the complaint. Upholding the jurisdiction of the District Court of this suit, we will request the Court to review de novo the action of the Comptroller. To this end the order annulling and enjoining his issuance of a certificate of approval to the First National Bank of Eastern North Carolina will be vacated and the case remanded, the District Court being empowered to reinstate its injunction pendente lite if it should be so advised. Whitney Nat. Bank v. Bank of New Orleans & Trust Co., supra, 379 U.S. 411, 85 S.Ct. 551.
 
 
 25
 Reversed and remanded.
 
 SOBELOFF, Circuit Judge (dissenting):
 
 26
 With great respect, I take a different view from my brethern as to the nature of the issues raised in this case.
 
 
 27
 The plaintiff, First National Bank of Smithfield, North Carolina, was notified in July, 1963, that First National Bank of Eastern North Carolina had applied to the Comptroller for permission to open a branch in Smithfield, North Carolina. Smithfield promptly requested the Comptroller to give it access to the application, the supporting data, and the report of the Regional Bank Examiner, so that it could attempt to refute them at the informal conference set before the Comptroller. This request was denied.
 
 
 28
 The Comptroller offers no explanation for denying this seemingly reasonable request, nor does he point to any interest to be served by the denial. We move here in no area involving emergency or security considerations. The Comptroller's position strikes me as unfair, unwise and administratively unnecessary. History has given impressive evidence of the necessity for informed and objective regulation of our banking system. Questionable banking practices and excessive competition in the past led to disastrous results during the Great Depression. By affording objecting banks an adequate opportunity to be heard the Comptroller receives the benefit of a report suggesting reasons why the particular application should not be granted. The self-interest of the complainant may thus serve the public interest by raising considerations that might otherwise never come to light before the Comptroller. Thus, in presenting its own position, the objecting bank is also arguing that of the community which has a vital interest in the solvency of its local banks. The bank can perform this useful function only if it is allowed to know the supporting data presented to the Comptroller by the applicant.
 
 
 29
 The plaintiff bank is acutely interested in the competition threatened by Eastern's application for permission to establish a branch bank in Smithfield, North Carolina. Rightly, I think, the majority holds that this interest is sufficient to entitle the Smithfield bank to appeal from the Comptroller's decision granting the application. Smithfield contends, however, that this right of appeal is meaningless unless it has previously been given an effective chance to be heard before the Comptroller reaches his final decision on the merits of the application. With this contention I agree, and would hold that such an opportunity, if requested, is a prerequisite to a valid decision on the part of the Comptroller. The right of the plaintiff to appear is of little worth to it if there is no disclosure of the pertinent data and if the Comptroller may make up his mind in a private huggermugger with the applicant.
 
 
 30
 The action of the Comptroller in issuing a branch bank license, being based in large part on an exercise of discretion, cannot in any true sense be subjected to review do novo, as my brethren indicate, for it may be reversed only if it is found to be 'arbitrary, capricious (or), an abuse of discretion.' 5 U.S.C.A. 1009(e); Community National Bank of Pontiac v. Saxon, 310 F.2d 224, 226 (6th Cir. 1962). If an objector has been granted no adequate opportunity to present his position before the case reaches the district court stage, a protest will usually be of little avail since the decision under attack comes clothed with a presumption of correctness.
 
 
 31
 Smithfield's argument is that it should be allowed to inform itself and express its views before the Comptroller arrives at his decision which will be accorded a large measure of finality in any appeal. Although the court review my brethren hold out to the complaining party may euphemistically be called a hearing de novo, the complainant comes into the reviewing court severely hobbled. The Comptroller's mind has been made up ex parte upon hearing from the proponent only, but not effectively from any opponents, for they have been kept in the dark as to the issues and the evidence. The operative scope of the court review being limited, it cannot easily repair any damage resulting from the inadequate practice followed by the Comptroller.
 
 
 32
 I have difficulty, as I think the District Judge on remand will have difficulty, in reconciling two statements in the majority opinion. First it is said that 'there is no place in the review for an opening-presumption of correctness of any fact which it may appear to the Court was adopted by the Comptroller for his decision.' (It bears repeating that the Comptroller makes a secret of the facts he has adopted.) In the second statement the court says: 'If after the court has made its fact findings, it then appears that the decision of the Comptroller is dependent upon an exercise of discretion, the Court cannot substitute its discretion for the Comptroller's. However, it can set aside such a determination if, in the light of the facts found by the Court, it concludes that the Comptroller has abused, exceeded or arbitrarily applied his discretion.'
 
 
 33
 How can the District Court conduct a proper examination if the Comptroller has not disclosed what issues he is resolving? The District Court is told to make its own de novo fact-findings, but it is still in no position to judge how far the Comptroller's decision rests upon fact-findings which the court deems erroneous and how far it is an exercise of discretionary judgment. It is not apparent how the District Court, observing the admonition against any openingpresumption of correctness, can be sure that it is not intruding in the area of the Comptroller's discretion, for concededly the court may not substitute an independent discretion.
 
 
 34
 The Comptroller has not divulged his mental processes, and his determinations of fact, rulings of law and exercises of discretion and judgment are inextricably intermingled. The District Court is thus placed in the unhappy position of choosing between two equally unacceptable alternatives. Either it must blindly assume that the Comptroller's discretion rests upon an adequate basis in fact, in which event the court review almost inevitably becomes a meaningless gesture; or the District Court, proceeding upon the basis of facts independently determined by it, must act in ignorance of the nature of the decision it is reviewing, in which case the court's judgment is liable to usurp the Comptroller's function. We should not require or tolerate such a game of 'blind man's bluff.' The majority opinion leaves the District Court without guidance in the dilemma thus created.
 
 
 35
 The District Court held, in accordance with the objecting bank's contention, that a permit issued by the Comptroller after his bobtailed procedure ought not be permitted to stand. While the court's order setting aside the Comptroller's action did not in terms order a rehearing, it was left open to the Comptroller to remedy the deficiency by holding an appropriate administrative hearing.
 
 
 36
 The indiscriminate use of the term 'hearing' has tended to obscure the issues in this case. An administrative hearing may be either a formal, trialtype procedure or an informal conference. For many years the Comptroller pursued the latter course with great success, and I share the majority's reluctance to interfere. With a different but perhaps analogous question before it (namely the appointment of a receiver), the Supreme Court has indeed noted that more formal procedures, constitutionally necessary in some situations, may not be indispensable in banking cases because of 'the delicate nature of the institution and the impossibility of preserving credit during an investigation * * *.' But the Court went on to warn that this 'is a heavy responsibilty to be exercised with a disinterestedness and restraint * * *.' Fahey v. Mallonee, 332 U.S. 245, 253-254, 67 S.Ct. 1552, 1556, 91 L.Ed. 2030 (1947).
 
 
 37
 The absence of a constitutional compulsion to conduct a trial-type hearing does not completely answer the objecting bank's protest. The Comptroller's utilization of informal conferences to settle controversies arising out of branch bank applications is certainly an efficient procedure, but while informality is permissible, it may not be administered unfairly.
 
 
 38
 More attention needs to be paid to the problem of protecting against arbitrary exercises of administrative discretion when it is decided that the safeguards of a trial-type hearing are not appropriate. In commenting on this problem a pioneering authority in this field has said:
 
 
 39
 'Fair procedure is vital even when (the procedure) is entirely as informal as conversation. Informal procedure is not the equivalent of no procedure. For instance, before an agency makes a discretionary determination that affects a party adversely, the procedural protection is very great if the officer will tell the party what he believes the facts to be, and what he contemplates and why, and then if the officer listens to what the party has to say. The fundamentals of procedural fairness can be observed even in an informal conference * * *.' I Davis, Administrative Law Treatise 4.14 (1965 Supp.).
 
 
 40
 In fact, Professor Davis has commented directly upon the decision of the District Court in this case. While he adheres to the view that an informal procedure, such as a conference, is preferable in these circumstances to a trial-type hearing-- a view with which I agree-- he is nevertheless critical of the procedure followed by the Comptroller in the instant case. He states:
 
 
 41
 'But even if a conference method is used, the basic principle of fairness that each party should be entitled to know the materials on the other side may still be applicable.
 
 
 42
 'The Comptroller had little or nothing to gain by denying the existing bank a chance to see the application, the supporting data, the report of the Regional Bank Examiner, and the Comptroller's decision.' 1 Davis, Administrative Law Treatise 4.04 (1965 Supp.).
 
 
 43
 If the Comptroller wishes to continue to use informal proceedings to deal with branch applications he must make sure that the proceedings are fair. Banks potentially affected, which desire to contest an application, should be permitted reasonable access to relevant materials and an opportunity to have their say, if only informally. I would remand the case to the District Court for its return to the Comptroller with instructions to make available to the plaintiff the requested information. Thereafter a conference should be held at which the Smithfield bank may articulate its opposition. Such disposition of the case is preferable to the so-called hearing de novo in court which the majority orders. An informed conference before the Comptroller would not only be more just to the complaining bank but would tend less to disrupt the orderly conduct of the Comptroller's office.[1]
 
 
 
 [1]
 Banking Act of 1933, 48 Stat. 189, 190, as amended, 12 U.S.C. 36(c), (e) (1964 Ed.)
 
 
 [2]
 60 Stat. 237 (1946), as amended, 5 U.S.C. 1001 et seq. (1964 Ed.). Section reference hereinafter will be to U.S.C. (1964 Ed.)
 
 
 [3]
 First Nat. Bank of Smithfield, N.C. v. First Nat. Bank of Eastern, N.C., 232 F.Supp. 725 (E.D.N.C.1964)
 
 
 [4]
 Section 36(e), also, provides: 'No branch of any national banking association shall be established or moved from one location to another without first obtaining the consent and approval of the Comptroller of the Currency.'
 
 
 [5]
 But cf. Whitney Nat. Bank v. New Orleans Bank & Trust Co., 379 U.S. 411, 423, 85 S.Ct. 551 (1965) posing the query whether the action of the Comptroller in granting an original charter is more than routine
 
 
 [1]
 The Comptroller has called our attention to the recent case of Continental Bank v. National City Bank, 245 F.Supp. 684 (N.D. Ohio, August 20, 1965). Its relevance to the instant case is sharply diminished by the fact that it deals only with the question of whether a full-blown, trial-type hearing by the Comptroller was required. While the court refused to order such a hearing, it is noteworthy, as the court pointed out, that the objecting bank was afforded an opportunity to present pertinent information to the Comptroller, and that the Comptroller himself argued that the written application of the national bank would have been made available to the objecting bank had a request been made