**BANK OF HAW RIVER, Plaintiff,**

v.

**James J. SAXON, Comptroller of the Currency of the United States, Defendant,**

and

**First National Bank of Eastern North Carolina, Intervener.**

**No. C-124-G-65.**

United States District Court
M. D. North Carolina,
Greensboro Division.

Aug. 18, 1966.

Jordan, Morris & Hoke, Raleigh, N. C., for plaintiff.

William H. Murdock, U. S. Atty., for Middle Dist. of North Carolina, and Richard S. Beatty, Atty., Dept. of Justice, Washington, D. C., for defendant.

Carl V. Venters, Jacksonville, N. C., and Ross, Wood & Dodge, Graham, N. C., for intervener.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

EDWIN M. STANLEY, Chief Judge.

The plaintiff, Bank of Haw River, instituted this action on July 14, 1965, seeking a preliminary and permanent injunction against the defendant, James J. Saxon, Comptroller of the Currency of the United States, from issuing a certificate authorizing the First National Bank of Eastern North Carolina to establish and operate a branch in Graham, Alamance County, North Carolina. First National Bank of Eastern North Carolina was allowed to intervene and file answer.

The case was tried to the Court without a jury on April 25 and 26, 1966. At the conclusion of the trial, the parties were given specified times within which to file requests for findings of fact and conclusions of law and briefs.

After giving due consideration to the evidence offered by the parties, including exhibits, requests and briefs filed, and argument of counsel, the Court makes and files herein its Findings of Fact and Conclusions of Law, separately stated:

1. The plaintiff, Bank of Haw River, is a State bank organized and existing under the laws of the State of North

Carolina, with its principal office in Haw River, an unincorporated community in Alamance County, North Carolina. In addition to its principal office, plaintiff operates a branch in what is known as the Cum-Park Plaza Shopping Center in the City of Burlington, Alamance County, North Carolina, and a branch in Glen Raven, adjacent to the City of Burlington.

2. The defendant, James J. Saxon, is the Comptroller of the Currency of the United States.

3. The intervener, First National Bank of Eastern North Carolina, hereinafter referred to as "First National," is a national banking association organized and existing under the laws of the United States, with its principal office in New River Shopping Center, Jacksonville, Onslow County, North Carolina. In addition to its principal office, it operates seventeen branches throughout eastern North Carolina, one branch in the Town of Boone, Watauga County, in western North Carolina, and a depository facility on the United States Marine Corps Base Air Facility, New River, North Carolina.

4. The Bank of Haw River was organized in 1911 with a capital of $10,-000.00. On April 5, 1966, the bank had a capital of $600,000.00, deposits of $4,-500,000.00, loans of $3,075,000.00 and total resources of $5,375,000.00.

5. First National was organized in 1952 with a capital of $10,000.00, surplus of $25,000.00, and undivided profits of $25,000.00. At the end of 1965, the bank had a capital of $1,900,000.00, deposits of $35,311,362.00, and loans of $23,203,-519.00.

6. On June 17, 1965, First National made application to the Comptroller for permission to operate a branch bank in the City of Graham, North Carolina. Graham is approximately 165 miles from the home office of First National.

7. On July 7, 1965, the Bank of Haw River filed with the Comptroller a request that it be furnished with certain information with respect to the application of First National, and that it be heard in opposition to the application. It further requested that a record be made of the hearing and that the decision on the application contain findings of fact and conclusions of law.

8. On July 14, 1965, this action was filed seeking to preliminarily and permanently enjoin the Comptroller from issuing a certificate authorizing First National to establish and operate a branch in Graham. Accompanying the complaint was a motion for preliminary injunction.

9. On July 16, 1965, an order was entered allowing the First National to intervene and file answer.

10. On August 26, 1965, the parties filed with the Court a stipulation that the Comptroller would notify the plaintiff of his intention to issue a certificate authorizing First National to establish and operate a branch in Graham, if he decided to issue such certificate, and that the Comptroller would not issue such certificate until the Court had heard the pending motion for a preliminary injunction.

11. On October 14, 1965, the parties stipulated that all further proceedings in this action be stayed pending a decision by the Court of Appeals for the Fourth Circuit in the case of First National Bank of Smithfield, North Carolina v. Saxon.

12. On January 21, 1966, plaintiff applied to the Court for a hearing on its motion for preliminary injunction, stating that the Comptroller had, on January 19, 1966, given notice of his intention to issue a certificate authorizing First National to establish and operate a branch in Graham.

13. On February 18, 1966, First National filed a motion to dismiss or, in the alternative, for summary judgment. A similar motion was filed by the Comptroller on February 21, 1966.

14. On March 17, 1966, following a hearing, orders were entered (1) restraining the Comptroller, pending a *de novo* hearing, from issuing a certificate evidencing his approval of First National to establish and operate a branch in Graham, (2) granting the plaintiff a *de*

*novo* hearing on the application of First National to establish a branch bank in Graham, and (3) denying the motions of the Comptroller and First National to dismiss or, in the alternative, for summary judgment.

15. Pursuant to the request of the plaintiff that the Comptroller hold a hearing on the application of First National, the Comptroller wrote counsel for plaintiff on September 30, 1965, advising that the hearing would be held on October 11, 1965, in the Main Treasury Building, Washington, D.C.

16. At the opening of the hearing, the Comptroller announced that no witness would be subject to cross examination without the consent of the witness and that no witness would be sworn, and First National announced that it would offer no evidence in support of its application. Plaintiff then presented six witnesses and a number of exhibits, all to the effect that there was no public interest, need or necessity for additional bank facilities in Graham. This is the only hearing of any type ever conducted in connection with the application.

17. On January 13, 1966, the Comptroller wrote First National a letter advising that its application to establish a branch at Graham had been approved. The letter did not recite any facts whatever justifying the action of the Comptroller.

18. On February 21, 1966, the Comptroller following his approval of the application of First National, filed with the Court a certified copy of his administrative file. The file contains nothing more than the application of First National to establish a branch at Graham, supplemental information furnished by First National, a protest filed by the National Bank of Alamance, a commercial bank in Graham, the report of an investigation conducted by the Comptroller, supplemental information developed by the Comptroller, and documents furnished by the plaintiff in connection with its protest. The report of the investigation conducted by the Comptroller contains little information, if any, bearing on the question before him. Among other things, the report observed that First National had been establishing branches quite rapidly in view of its size and earnings, but that its branches were believed to be on a profitable basis, except for the branch most recently opened. It was further observed that the information submitted by First National appeared to be reasonably accurate since it was generally taken from brochures of the Burlington-Alamance County Chamber of Commerce. The examiner was unable to obtain a satisfactory explanation as to why there had been a substantial decrease in retail and wholesale trade in the Graham area between 1958 and 1963. It was estimated that First National would earn a profit of $10,000.00 during its first year of operation, and that this would increase to $50,000.00 during the third year. One of the unfavorable factors found was the disadvantage of First National operating a branch office a distance of 165 miles from its home office, together with such problems as might be presented by local competition. The summary and recommendations of the investigator were deleted or blocked out before the file was transmitted to the Court, and is thus not available. The supplemental information developed by the Comptroller, which contains the recommendations of his field investigators, both favorable and unfavorable, with reasons for the recommendations, was also deleted or blocked out before the administrative file was furnished to the Court.

19. At the trial on April 25 and 26, 1966, the parties offered numerous witnesses and documents in support of their respective positions. Some of the witnesses and documents indicated the need for additional banking facilities in Graham, while others indicated no public interest, need, necessity or interest would be served by the establishment of another bank in the Graham area.

20. The City of Graham is the county seat of Alamance County. Its northern and western corporate boundary lines are contiguous to the southern and eastern corporate boundary lines of the City of

Burlington. The population of Graham in 1950 was 5,020, and the population in 1960 was 7,723. The population of Burlington in 1950 was 24,560, and its population in 1960 was 33,199. The population of Alamance County in 1960 was 85,674, an increase of 14,454 over its 1950 population of 71,190. There is only one commercial bank, namely, the National Bank of Alamance, within the corporate limits of the City of Graham. This bank, however, has a drive-in branch at another location in Graham. Deposits in the National Bank of Alamance as of December 31, 1964, amounted to $9,305,000.00, and as of December 31, 1965, the deposits amounted to $10,289,000.00.

21. Other than the National Bank of Alamance and its drive-in branch, the only financial institutions in the City of Graham are the Graham Savings and Loan Association, with total resources as of December 31, 1964, of $10,400,000.00, and Graham Production Credit Association, a Federal farm loan institution. There are also small loan finance companies.

22. Located in the City of Burlington, in addition to plaintiff's Cum-Park Plaza Shopping Center Branch, are four commercial banks, namely, Wachovia Bank and Trust Company, North Carolina National Bank, Morris Plan Bank, and Northwestern Bank. Wachovia Bank and Trust Company has three branches, and North Carolina National Bank has two branches. Wachovia Bank and Trust Company and North Carolina National Bank are two of the largest banking institutions in the State. All the banks in Burlington are located less than three miles from the proposed location of First National's proposed branch in Graham.

23. For all purposes pertinent, Graham and Burlington constitute one working and trading area. Only an invisible corporate boundary line separates the two cities in the north and west. They have a joint chamber of commerce. The majority of the citizens of Graham work and trade in Burlington. Considering Burlington and Graham to be one working and trading area, the existing banking facilities for the area already greatly exceed the national average.

## DISCUSSION

The plaintiff, a potential competitor of First National, clearly has an interest sufficient to challenge the procedures followed by the Comptroller in authorizing First National to establish a branch at Graham. The scope and extent of judicial review of the Comptroller's decision is dependent upon whether he conducted a hearing before making his decision. He was not required to make an evidential record or to make findings and conclusions, but if he acted in a unilateral manner, the plaintiff is entitled to a *de novo* hearing in this court without being held to the substantial-evidence rule or "an opening-presumption of correctness of any fact which it may appear to the Court was adopted by the Comptroller for his decision." First National Bank of Smithfield, North Carolina v. Saxon, 4 Cir., 352 F.2d 267, 272 (1965).

There can be no question but that investigation conducted by the Comptroller was wholly unilateral, except for the so-called hearing conducted in Washington, D.C., on October 11, 1965. Even at this hearing, neither the Comptroller nor First National offered any evidence, documentary or otherwise, in support of the application. Witnesses were told that they need not be sworn and were not subject to cross-examination. It is perfectly evident that the Comptroller was attempting to do nothing more than placate the plaintiff, and indeed the Court, by trying to make his action resemble some type of hearing. Never has the Comptroller revealed to the plaintiff or the Court the evidence before him at the time he made his decision, and he gives no plausible or rational reason as to why he deleted or blocked out important parts of his administrative file before certifying it to the Court.

The entire procedure followed by the Comptroller fell far short of affording the plaintiff a hearing. A hearing

means "that every party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. Cf. 5 U.S.C. § 1006(c), 5 U.S.C.A. § 1006 (c). Such a hearing is essential for wise and just application of the authority of administrative boards and agencies." United States v. Storer Broadcasting Co., 351 U.S. 192, 202, 76 S.Ct. 763, 770, 100 L.Ed. 1081 (1956). "A requirement of a full hearing means one in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety, from the standpoint of justice and law, of the steps asked to be taken. Under general requirements applicable to quasi-judicial proceedings, or under the requirement of a full hearing, a party has the right, and the hearing must afford him the opportunity, to defend the right involved, by argument, proof, and the cross-examination of witnesses, and the trier of the facts must reach his decision in accordance with the facts proved." 42 Am. Jur. Public Administrative Law, § 138. It is obvious that the hearing conducted by the Comptroller did not remotely meet these requirements.

Since the Comptroller denied the plaintiff a hearing, it is the duty of this Court to find the facts and "judge de novo the validity, in fact and in law, of the Comptroller's final action." First National Bank of Smithfield, North Carolina, v. Saxon, Supra. In making this determination, as earlier noted, the Court is not held to the substantial-evidence rule, and any fact found by the Comptroller is not entitled to an opening-presumption of correctness.

The evidence in this court went far beyond that which was before the Comptroller. While the testimony of the witnesses is in sharp conflict in certain respects, all the evidence clearly establishes that the Graham-Burlington community constitutes one service or trading area. The only expert of scientific evidence on the point was offered by the plaintiff in the testimony of Dr. Rollie Tillman, Professor of Marketing in the Graduate School of Business Administration, University of North Carolina at Chapel Hill. Dr. Tillman was found to be an expert in the field of marketing research. After describing his investigation, and stating the basis of his conclusions, Dr. Tillman defined the service area for the proposed branch bank to be the whole of the Graham-Burlington area. He pointed out that the political boundaries of the two municipalities can no longer be considered economic or trade area boundaries for the reason that the two municipalities have merged into one economic area and one market. Other evidence offered by the plaintiff tended to support and confirm Dr. Tillman's conclusions, and the defendant and intervener offered no evidence to the contrary. Additionally, the record establishes that from 60 to 90 per cent of the residents of Graham work in Burlington. This being true, it necessarily follows that the greater portion of the Graham residents do not even need the existing banking facilities in Graham. This is best illustrated by the fact that Wachovia Bank and Trust Company alone carries 1100 deposit accounts for Graham in its Burlington office, and Wachovia is only one of the five Burlington banks which serve the Graham-Burlington area. Also significant is the fact that both the Graham City Council and the Alamance County Commissioners defeated resolutions endorsing the application of First National to establish a branch in Graham.

The record further establishes that the Graham-Burlington service area is already considerably over-banked. Since the present ratio of existing banking offices to population is far in excess of both State and National averages, there can be no question but that the existing banks, with resources well in excess of two billion dollars, amply meet the capital needs of the Graham-Burlington area. Most of the witnesses offered by the defendant and First Nation-

al were unable to cite any significant need or necessity for the addition of another banking office in the community. Most of their testimony was based on civic pride and the notion that competition in every kind of business is good. The answer to this argument is that strong competition already exists among the various banks of the area.

And finally, the evidence fails to establish that it would be economically feasible to establish an additional bank in Graham at this time. The slow population growth of Graham, coupled with the large number of Graham citizens working and trading in Burlington, and the deposit trends of the National Bank of Alamance during the past thirteen years, tend to show it would not be in the public interest to establish another bank in Graham.

In summary, the record, considered, as a whole, clearly establishes that the service area of the proposed branch is the Graham-Burlington area; that existing banking institutions in this area provide a full range of all banking services of good quality; that no substantial public or business interest, need or necessity would be served by the establishment of the new bank; and that a new banking facility in the area would not be economically feasible. Further, based on the adminstrative file certified to this Court, there was nothing before the Comptroller showing a public interest, need or necessity for the establishment of another bank in Graham, and he abused and exceeded his discretion when he approved the application of First National.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter.

2. No public interest, need or necessity has been shown for the establishment of a branch of First National in Graham, North Carolina, and it is impermissible for the Comptroller to approve the establishment of such a branch.

3. The plaintiff is entitled to the injunctive relief sought.