**FIRST CITIZENS BANK AND TRUST COMPANY, Plaintiff,**

v.

**William B. CAMP, Comptroller of the Currency of the United States, Defendant,**

and

**First Union National Bank of North Carolina, Intervenor.**

**FIRST CITIZENS BANK AND TRUST COMPANY, Plaintiff,**

v.

**William B. CAMP, Comptroller of the Currency of the United States, Defendant,**

and

**North Carolina National Bank, Intervenor.**

Civ. Nos. 1663, 1870.

United States District Court
E. D. North Carolina,
Raleigh Division.

March 18, 1968.

John R. Jordan, Jr., of Jordan, Morris & Hoke, Raleigh, N. C., for plaintiff, First Citizens Bank and Trust Co.

Robert H. Cowen, U. S. Atty., Raleigh, N. C., Edwin L. Weisl, Jr., Asst. Atty. Gen., Harland F. Leathers, Atty., Dept. of Justice, C. Westbrook Murphy and Kirtley M. Thiesmeyer, Attys., Office of Comptroller of Currency, Washington, D. C., for defendant, William B. Camp, Comptroller of Currency of U. S.

Hugh Cannon, of Sanford, Cannon, Adams & McCullough, Raleigh, N. C., for intervenor, First Union Nat. Bank of N. C.

Charles T. Hagan, Jr., of Adams, Klee-meier, Hagan & Hannah, Greensboro, N. C., and A. L. Purrington, Jr., of Purring-ton, Joslin, Culbertson & Sedberry, Raleigh, N. C., for intervenor, North Carolina Nat. Bank.

## MEMORANDUM OPINION

EDWIN M. STANLEY, District Judge.*

These cases, consolidated for administrative decision, are before the Court

* Chief Judge, United States District Court For the Middle District of North Carolina Sitting by Designation.

upon the cross-motions of the plaintiff, defendant, and intervenors for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure. In the alternative, the plaintiff has also moved for a trial de novo in each case. Since the cases were consolidated for consideration and decision by the Comptroller, and both involve applications by the intervenors to establish branch banks in the North Hills Shopping Center, Raleigh, North Carolina, they are consolidated for consideration of the pending motions.

On October 16, 1964, First Union National Bank applied to the Comptroller for permission to establish a branch bank in the North Hills Shopping Center, Raleigh, North Carolina. Plaintiff, First Citizens Bank and Trust Company, protested the application, and on January 14, 1965, filed Civil No. 1663 to enjoin the Comptroller from issuing permit authorizing the establishment of the branch. By stipulation of the parties entered on February 1, 1965, court proceedings were stayed pending action by the Comptroller on the application. First Union National Bank was later permitted to intervene in the litigation.

On March 17, 1966, North Carolina National Bank also applied to the Comptroller for authority to establish a branch bank in the North Hills Shopping Center. Plaintiff protested this application, and on June 6, 1966, filed Civil No. 1870 to enjoin the Comptroller from issuing a permit authorizing the establishment of the branch. On June 13, 1966, by stipulation of parties, court proceedings were stayed pending action of the Comptroller on the application. North Carolina National Bank was later permitted to intervene in the litigation.

On October 28, 1966, the Comptroller gave notice of his intention to issue certificates for both branches, and on December 20, 1966, plaintiff moved in both actions for preliminary injunction and for trial de novo. On December 21, 1966, the Court entered an order restraining the Comptroller, pending final judgments in these actions, from the issuance of certificates evidencing his approval of the applications.

On February 27, 1967, following conference with counsel, and after giving consideration to the decision of the United States Supreme Court in First National Bank of Logan, Utah v. Walker Bank and Trust Company, 385 U.S. 252, 87 S. Ct. 492, 17 L.Ed.2d 343 (1966), orders were entered remanding both applications to the Comptroller for another hearing, and directing that the hearing be conducted in accordance with the Comptroller's newly-promulgated rules and procedures. The Comptroller was further directed, following the hearings, to make new findings of fact and conclusions of law with reference to the standards for the establishment of branch banks under the laws of the State of North Carolina. It was the stated view of the Court that the *First National Bank* decision clearly holds that all statutory law requirements of the State dealing with the establishment of branch State banks must be complied with before a branch national bank can be lawfully approved by the Comptroller.

Pursuant to the aforementioned orders, additional administrative hearings were held on April 10 and 11, 1967, with respect to the application of First Union National Bank, and on April 12, 13, 14, 27, 28 and May 17, 18, and 19, 1967, with respect to the application of North Carolina National Bank. The plaintiff fully participated in both hearings.

On November 28, 1967, the Comptroller issued a further written opinion approving the applications of both intervenors. Following a certification of the entire administrative proceedings back to this Court, all parties in interest filed motions for summary judgment, and the plaintiff, in the alternative, moved for a trial de novo. Each motion was accompanied by a comprehensive brief, and counsel later appeared before the Court and argued their respective positions.

The Comptroller of the Currency is authorized to approve the establishment of branch national banks if such estab-

lishment is "at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State Banks." [1] The North Carolina Commissioner of Banks is given discretionary authority to approve the establishment of branch State banks upon a finding that (1) "the establishment of such branch * * * will meet the needs and promote the convenience of the community to be served," (2) "the probable volume of business and reasonable public demand in such community are sufficient to assure and maintain the solvency of said branch * * * and of the existing bank or banks in said community," and (3) the capital of the applicant bank and each of its branches meets certain statutory requirements.[2]

The plaintiff concedes that the intervenors have sufficient capital to satisfy statutory requirements, but contends that the Comptroller failed to make certain critical findings of fact with respect to the other two criteria; that the findings that he did make with respect to these criteria are unsupported by substantial evidence; and that his decisions to approve the applications of the intervenors were unfair, arbitrary and capricious. As a consequence, the plaintiff asks the Court to either enjoin the Comptroller from issuing certificates authorizing the intervenors to establish branch banks at the North Hills Shopping Center, or in the alternative that plaintiff be granted a trial de novo in these proceedings on all issues.

 The task of the Court in resolving the conflicting contentions of the parties is made unnecessarily difficult by reason of the failure of the Comptroller to accept his clearly defined responsibility in processing applications to establish branch national banks. For some unsatisfactorily explained reason, he insists,

and spends a good portion of his brief arguing, that he is only bound by "capital" and "location" restrictions of State law in considering applications of national banks to establish branches. This argument is made in face of the recent decision of the Supreme Court in First National Bank of Logan, Utah v. Walker Bank and Trust Company, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966), which specifically holds that "national branch banking is limited to those States the laws of which permit it, and even there *only to the extent that the State laws permit branch banking,*" and that the Comptroller is not permitted to "pick and choose what portion of the law binds him." (Emphasis supplied.) That the "measuring stick of national branch banks is state law," and that the Comptroller must "look at all the State law on branch banking not just part of it," is no longer arguable. Walker Bank and Trust Company v. Saxon, 10 Cir., 352 F. 2d 90 (1965), affirmed First National Bank of Logan, Utah v. Walker Bank and Trust Company, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). The administrative files and records in both proceedings are voluminous. At the conclusion of the administrative hearing, the plaintiff and both intervenors submitted requests for extensive findings of fact and conclusions of law. Notwithstanding these submissions, and the directive of the Court in its remand order of February 27, 1967, the Comptroller chose to issue his written opinion approving the applications in a relatively short memorandum which either ignored, or only made slight reference to, many of the contested issues.

 On the merits, the alternative motion of the plaintiff for a trial de novo on all issues is first considered. An examination of the record clearly discloses that the Comptroller, particularly with respect to the administrative hearings conducted pursuant to the remand order entered on February 27, 1967, afforded

---

1. 12 U.S.C. § 36(c) (2).

2. § 53–62, General Statutes of North Carolina.

plaintiff a full and fair hearing on both applications. After having been given ample notice of the dates and places of the hearings, plaintiff was afforded (1) reasonable access to, and right to inspect, relevant material and supporting data, (2) the right to present its protests of both applications by oral and documentary evidence, and present arguments, (3) the right to submit rebuttal evidence, (4) the right to conduct cross-examination of all witnesses, and (5) the right to submit proposed findings of fact and conclusions of law with respect to both applications. Since we are not confronted with a situation comparable to that presented in Bank of Haw River v. Saxon, 257 F.Supp. 74 (M.D.N.C., 1966), where the proceedings before the Comptroller were unilateral, the plaintiff is not entitled to a de novo hearing with respect to the issues presented by either application.

Since it is conceded that the capital of both intervenors is amply sufficient to meet statutory capital requirements, and since State law permits the establishment of branch State banks at any place in the State, the two critical criteria upon which the Comptroller was required to make findings and conclusions are (1) whether the need and convenience of the community would be served by the establishment of the proposed branches, and (2) whether the probable volume of business in such community would be sufficient to insure and maintain the solvency of the proposed branches and the existing bank or banks in the community. With respect to these criteria, the Comptroller found:

"First, a large portion of the community surrounding North Hills Shopping Center is comprised of existing customers of both banks, who expect their bank to provide service in terms of convenience of location. First Union, the third largest bank in the state, has deposits exceeding $500,000 and over $1 million in loan volume originating in the North Hills area from over 500 existing area accounts. North Carolina National, the second largest bank in the state, has deposits of approximately $4.8 million and loan volume of over $3 million in the North Hills area. NCNB had 2446 deposit accounts in the area as of May 1967.

"Second, the demonstrable growth of this northern section of Raleigh's suburbs indicates that the North Hills community can support and needs the same caliber and variety of banking services as those which service downtown Raleigh. All four banks, the protestants, First Citizens and Wachovia, and the applicants, First Union and North Carolina National, compete vigorously throughout the Raleigh downtown and metropolitan area and this competition provides better and more convenient banking services for the public. North Hills, as the focal point of a marked northern growth pattern out from the city, represents an ideal location for the extension of this same high performance bank service.

"The location of the shopping center on U. S. 1 and the U. S. 64 Raleigh bypass and bordering two other major intowns arterials makes North Hills accessible to the major population of Raleigh and Wake County as well as to a wider geographical region surrounding the city. It is well-known that in the suburbs a bank's trading area may extend for several miles, crossing into different communities. A major thrust of population growth in Raleigh is north.

"A natural response to growth is expansion. The shopping center in North Hills was expanded in plans revised in 1965 to include a two level air conditioned mall with 530,000 square feet of space in one parcel, an 80,000 square foot center for convenience services in a second, and a five to six story office building with 80,000 square feet of space in a third parcel. Retail sales jumped from 4½ million in 1964 to 7 million in 1966. J. C. Penney's Department Store is expected to be the last major tenant to open with a target date of February 1968. When completed, the shopping center is expected to have 77 stores, parking for 4200 cars with

up to 1500 employees. As of April 1967, 28 of the projected 55 stores in the central mall portion of the shopping center were open.

"In addition to the industrial and residential development described in the Comptroller's original opinion, there was testimony as to the size and stage of development of approximately seventeen different residential and apartment projects in the North Hills area. Homes range in price from $14,-000 to $125,000 with lot sizes varying accordingly. Development tracts range in size from 900–1000 acres down to those developed tracts with only 20–30 acres. A full facility country club and 1000 homesites are scheduled for completion in early 1968. Waiting lists for new apartments in the North Hills area are indicative of the steady increase in population concentration and in the not-too-distant future, the area may encompass 35,000 to 50,000 people.

"Third, each of the applicant banks will bring new types of banking services to this area. First Union National Bank operates a charge plan which calls for frequent deposit trips by the participating merchants. North Carolina National Bank has a different credit card program with thirteen member firms in North Hills. North Carolina National Bank also offers non-passbook savings accounts and 5 percent bonus savings accounts.

"Fourth, the President of the Raleigh operations of First Citizens Bank and Trust Company testified that the presence of additional competition would not cause the assets of First Citizens to become insufficient to pay its liabilities to depositors and other creditors, and that as of April 1967, the entire Raleigh operation of First Citizens composed of nine branches was making a profit.

"Fifth, the addition of either or both of the two new banking offices applied for, on the basis of economic studies made by the Comptroller's Office as to the general effect of the introduction of new branches, is likely to increase deposits at the existing North Hills branches of both the First Citizens Bank and Trust Company and the Wachovia Bank and Trust Company."

Based upon the foregoing findings, and "upon the entire record of both applications" before him, as well as his general knowledge "of the banking industry as a whole and of the North Carolina banking climate and the Raleigh situation in particular," the Comptroller concluded:

"(a) The establishment of either or both of the North Hills branches applied for respectively by the First Union National Bank of North Carolina and the North Carolina National Bank will meet the needs and promote the convenience of the community to be served by these branches; and

"(b) The probable volume of business and reasonable public demand in such community are sufficient to assure and maintain the solvency of these two new branches and of existing banks in the community."

Although the issue is not contested, the Comptroller further found that intervenor, First Union National Bank, to support its 103 approved branches, including the North Hills branch, had capital of $13,925,316 in excess of State law requirements, and that intervenor, North Carolina National Bank, to support its 78 approved or applied for branches, including the North Hills branch, had capital of $30,908,570 in excess of State law requirements.

If the Comptroller has made legally sufficient findings and conclusions on the contested criteria prescribed by G.S. § 53–62, and such findings and conclusions are supported by substantial evidence, his action would be neither unfair, arbitrary nor capricious, and must be approved. First National Bank of Smithfield, North Carolina v. Saxon, 4 Cir., 352 F.2d 267 (1965). Conversely, if the Comptroller's findings and conclusions are found to be either legally insufficient or lacking in substantiality, plaintiff is

entitled to prevail upon its motions for summary judgment.

■ The substantial-evidence rule is a familiar principle of administrative law. "Substantial evidence is 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' [National] Labor [Relations] Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 [59 S.Ct. 501, 505, 83 L.Ed. 660] (1939)." Illinois Central Railroad Co. v. Norfolk & Western Railway Co., 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966). In reviewing the action of an administrative agency, it is not the function of the courts to resolve conflicts in evidence, and if the findings of the administrative agency "are supported by substantial evidence, the courts are bound to accept them." Thomas v. Celebrezze, 4 Cir., 331 F.2d 541 (1964). It is uniformly held that the scope of judicial review is "fully exhausted when the record disclose[s] substantiality in * * * support [of] the administrative findings * * *." Halsey v. Nitze, Secretary of the Navy, 4 Cir., 390 F.2d 142 (decided January 23, 1968). Moreover, when Congress has committed to an administrative agency, such as the Office of the Comptroller, a wide area of discretion, "which necessarily calls for difficult and expert judgment, * * * [j]udicial review of that expert judgment is necessarily a limited one." Securities and Exchange Commission v. New England Electric System, 390 U.S. 88 S.Ct. 916, 19 L.Ed.2d 1042 (1968).

In urging that the action of the Comptroller be disapproved, plaintiff makes two basic contentions. The first is that it has been denied due process of law by reason of the fact that there was no hearing on, and no evidence offered in support of, the simultaneous opening of two banking offices in the North Hills Shopping Center. Secondly, plaintiff asserts that the Comptroller abused his discretion in making findings that (1) the simultaneous opening of two banking offices in North Hills would promote the needs and convenience of the community to be served, and (2) the probable volume of business and reasonable public demand in the community to be served would be sufficient to assure and maintain the solvency of the new branches and the existing banks in the community.

■ While the written opinion of the Comptroller lacks much to be desired, the Court is of the opinion, after a detailed consideration of the entire administrative files and records in both proceedings, that there is no merit to plaintiff's argument. Although each application was processed separately, the Comptroller properly considered them together "because the relevant economic data and banking factors [were] nearly identical and because a decision to approve or not to approve one application [would] have a direct bearing on the consideration of the other." The evidence disclosed that both intervenors already had a substantial number of customers in the North Hills area, and the Comptroller was entirely justified in considering the needs and convenience of these individuals, as well as the needs and convenience of the customers of the plaintiff. The intervenors and the existing banks in the North Hills area already carried on extensive banking operations in downtown Raleigh, and the purpose of the intervenors was to establish branches in a rapidly growing suburban area in order to provide more convenient banking services for their existing customers already living in the area. There is no rational basis for contending that the customers of the intervenors must either switch their accounts to one of the existing banks or suffer the inconvenience of doing their banking in the downtown area. When considered in this light, the evidence is more than sufficient to show that the needs and convenience of the community to be served would be promoted by approving the applications of the intervenors. While no decisions have been cited or found dealing with the precise problem, it seems logical that the quantum of proof to show need and

convenience for the establishment of a branch office in a suburban area would be much less than that required to show need and convenience for the establishment of an entirely new banking facility in the city. In the first instance, no new banking facility is being established in the community, only a branch office of an existing bank. In the latter instance, an entirely new banking operation is being established to compete with existing banks.

Equally lacking in merit is the contention that the evidence fails to establish that the solvency of the plaintiff and the intervenors would not be adversely affected by the approval of the applications. The statute refers to the solvency of "said *branch*," and of the existing "*bank or banks* in said community." G.S. § 53–62. (Emphasis supplied.) Plaintiff offered evidence tending to show that its North Hills branch had not been a profitable operation, and points to the lack of evidence tending to show that the proposed North Hills branches of the intervenors would be profitable or that the establishment of the two new branches would not further affect the solvency of the plaintiff's existing branch. This argument is faulty in at least two respects. First, the record discloses that it is most difficult, if not impossible, to determine the solvency of a branch, as distinguished from the profits realized from area operations, when the bank already carries on other extensive operations in the community. In the second place, the statute refers to the solvency of the proposed *branch* and the existing *banks* in the community. Plaintiff is clearly not concerned with the solvency of the proposed branch offices of the intervenors, and the record conclusively demonstrates that the solvency of the plaintiff, as a banking institution, or even its total Raleigh operations, would not be materially affected by the approval of the two applications.

After a detailed examination of the entire administrative proceedings with respect to both applications, the Court finds that plaintiff received a full and fair hearing before the Comptroller, and that the Comptroller's findings and conclusions are substantially and rationally supported, and are neither unfair, arbitrary, nor capricious. It necessarily follows that the motion of the plaintiff for summary judgment, or in the alternative for a trial de novo, should be denied, and that the motions of the Comptroller and the intervenors for a summary judgment should be granted.

The restraining order entered on December 21, 1966, by its terms, expires upon the entry of final judgments in these actions. For the reasons explained to counsel at the time of oral arguments, the Court, in the event of an appeal by the plaintiff, declines to continue the restraining order pending decision by the Court of Appeals.

A judgment will be entered accordingly.