425 F.2d 333
 The RAMAPO BANK and Broadway Bank & Trust Company, both banking corporations of the State of N. J., and New Jersey Bank (National Association), a national banking association, formerly N. J. Bank and Trust Co., a banking corp. of the State of N. J.,
Horace J. Bryant, Jr., Commissioner of the Dept. of Banking and Insurance, State of N. J. (Plaintiff Intervenor),
v.
William B. CAMP, Comptroller of the Currency of the United States, and Prospect Park National Bank, a national banking association.
The Ramapo Bank and Broadway Bank & Trust Company, Appellants in No. 18022,
Horace J. Bryant, Jr., Commissioner of the Dept. of Banking and Insurance, State of N. J. (Plaintiff Intervenor), Appellant in No. 18117.
 No. 18022.
 No. 18117.
 United States Court of Appeals, Third Circuit.
 Argued September 19, 1969.
 Decided April 17, 1970.
 
 COPYRIGHT MATERIAL OMITTED Richard S. Miller, Williams, Gardner, Caliri, Miller & Otley, Wayne, N. J., for appellants Ramapo Bank and Broadway Bank & Trust.
 E. Robert Levy, Trenton, N. J. (Arthur J. Sills, Atty. Gen., of New Jersey, Joel L. Shain, Deputy Atty. Gen., Trenton, N. J., on the brief), for appellant Horace J. Bryant, Jr.
 Leonard Schaitman, Appellate Section, Tax Division, Dept. of Justice, Washington, D. C. (William D. Ruckelshaus, Asst. Atty. Gen., Donald Horowitz, U. S. Atty., Morton Hollander, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee William B. Camp.
 Herman Jeffer, Paterson, N. J. (Jeffer, Walter & Tierney, Paterson, N. J., on the brief), for appellee Prospect Park Nat. Bank.
 Before BIGGS, KALODNER and FREEDMAN, Circuit Judges.
 OPINION OF THE COURT
 KALODNER, Circuit Judge.
 
 
 1
 The instant appeals present substantial questions concerning the authority of the United States Comptroller of the Currency to issue certificates which would permit a nationally chartered bank simultaneously to relocate its main office and to retain its former main office as a branch, when similar action on the part of state banking institutions is barred by state law. At issue principally is the scope and application of Sections 30 and 36(c) (2) of the National Bank Act.[1]
 
 
 2
 Appellants are the Ramapo Bank and the Broadway Bank & Trust Company, both banking corporations of the State of New Jersey, and the New Jersey Commissioner of Banking and Insurance.[2] Defendants are William B. Camp, Comptroller of the Currency of the United States, and the Prospect Park National Bank ("PPNB"), a national banking association chartered in 1925 to conduct business in Prospect Park, New Jersey.
 
 
 3
 On May 17, 1968, PPNB applied to the Administrator of National Banks for permission to relocate its main office from Prospect Park to a site in the adjoining township of Wayne, New Jersey, a distance of 2.7 miles. The application and supporting documents stated that the relocation was necessary to relieve the overcrowded condition in the existing main office; to service customers who were moving away from Prospect Park to nearby suburban areas such as Wayne; and to move the bank from an area of declining population and economy into a rapidly developing community. The main office relocation was approved by a vote of 99 per cent of the PPNB shareholders.
 
 
 4
 PPNB is the only bank with offices in Prospect Park, a small, highly urbanized borough on the border of Paterson, New Jersey.[3] Wayne Township, in contrast, is a large suburban community in which over one-third of the land is available for development. While the population of Prospect Park has remained constant at about 5,200 since 1930, the population of Wayne has grown from 11,822 in 1950 to an estimated 47,000 in 1968. Wayne Township is currently served by six banking offices: the main office and branch of the appellant Ramapo Bank,[4] two branch offices of the New Jersey Bank, and two branches of the First National Bank of Passaic County.
 
 
 5
 PPNB's main office application was filed pursuant to 12 U.S.C. Section 30, which provides that a national bank may, with the approval of the Comptroller of the Currency and two-thirds of its shareholders, move its main office to any location outside of the municipality in which it is presently situated, but not more than 30 miles distant.[5] There is nothing in the language of Section 30 to indicate that the propriety of the relocation is made subject to state law.
 
 
 6
 In a separate but simultaneous application, filed pursuant to 12 U.S.C. Section 36(c) (2), PPNB sought approval for the retention of its former main office in Prospect Park as a branch. In support of its branch application, PPNB noted the substantial number of its customers who would continue to require banking facilities in Prospect Park.
 
 
 7
 Section 36(c) (2) also requires the approval of the Comptroller for the creation of a branch of a national bank, but additionally provides that the statute law of the particular state must specifically and affirmatively grant such authority to state banks.[6]
 
 
 8
 The State of New Jersey does not permit the establishment of branch offices by state banks in any municipality, other than that in which the main office is situated, if another banking institution has its principal office located there. N.J.S.A. 17:9A-19(B) (3).[7] Further, a state banking institution in New Jersey may not change the location of its principal office outside of the municipality in which it is situated. N.J.S.A. 17:9A-22, 23.[8] Thus, by virtue of the fact that the Ramapo Bank has its main office located in Wayne Township, it is clear that no other bank may establish a new branch office in Wayne.[9] It is equally clear that, if PPNB's main office were legally relocated in Wayne, PPNB could lawfully establish a branch in Prospect Park, since there is no other bank currently conducting business there. This, in essence, is what PPNB claims to have done by means of its concurrent applications; that is, lawfully relocate in Wayne pursuant to Section 30, and then establish a branch in Prospect Park pursuant to Section 36(c) (2) and applicable New Jersey branching law.
 
 
 9
 When PPNB's applications were brought to the attention of the New Jersey Commissioner and competing national and state banks, opposition was immediately voiced. In separate letters to the Comptroller dated June 3, 1968, the Ramapo Bank and the Commissioner set forth their belief that the planned main office relocation was in direct violation of New Jersey and federal banking statutes. Two other banks, the New Jersey Bank and the appellant Broadway Bank & Trust Company,[10] subsequently joined in the Notice of Opposition filed by the Ramapo Bank.
 
 
 10
 At the request of the protesting banks, the Comptroller's Regional Office conducted an informal hearing on August 20, 1968. Thereafter, both the Regional Administrator of National Banks and the National Bank Examiner assigned to investigate the applications, recommended that the applications be approved.[11]
 
 
 11
 On April 8, 1969, following his independent examination of the record, the Comptroller issued an Opinion in which he separately approved each of the PPNB applications. In so doing, the Comptroller found:
 
 
 12
 "* * * that the proposed relocation of the main office of Prospect Park National Bank is in all ways bona fide; that it is a prudent and necessary step to enable the applicant bank to continue serving both its shareholders and its depositors; that it will serve the public interest by establishing a banking office in Wayne Township where additional banking facilities are needed; that existing banks in the area will not be adversely affected; * *."[12]
 
 
 13
 The Comptroller further determined that the applications fully comported with the requirements of Sections 30 and 36(c) (2).
 
 
 14
 The following day, April 9, 1969, the protesting banks[13] commenced the instant declaratory judgment action in the United States District Court for the District of New Jersey, seeking preliminary and permanent injunctive relief enjoining the Comptroller from issuing a certificate of authority for PPNB to move its main office to Wayne, and enjoining PPNB from moving its main office.
 
 
 15
 In addition to alleging inadequacy of the Regional Director's hearing, the Complaint alleges that PPNB's applications are not authorized under 12 U.S.C. §§ 30 and 36(c) "since it does not intend in fact to relocate its `main office'" and "its operation in Wayne is intended to and will operate as a branch"; PPNB's applications "are a subterfuge intended to circumvent the requirements" of Section 36(c) "which requires that any branches to be established must be authorized by State law"; and "the applicable New Jersey law (17 N.J.S.A. 9A-22-23) would not permit" PPNB "to change the location of its principal or main office if it were a bank chartered under New Jersey law." The Complaint further alleges that "the doctrine of competitive equality between national and state banks" bars approval of PPNB's applications.[14]
 
 
 16
 The District Court denied the requested temporary relief. Thereafter, the plaintiff banks moved for the right to take depositions. The motion was opposed by the defendants, who moved to dismiss the action or, alternatively, for summary judgment. All motions were set down for hearing on May 19, 1969. The District Court, at the conclusion of the arguments, delivered an oral Opinion in which it sustained the approvals given by the Comptroller. In doing so it stated its function was limited to determining whether the Comptroller's action was "arbitrary and capricious, unwarranted in law and in fact."[15]
 
 
 17
 Following a detailed review of the administrative record, the District Court found that there was "no evidence which would support a conclusion that the proposed relocation of the main office of the Prospect Park National Bank is nothing but a mere subterfuge, and that, in fact, what is being called the main office is actually a branch."[16]
 
 
 18
 Concerning the statutory issue raised, it said:
 
 
 19
 "It is my opinion that Title 12 U.S. Code, Section 30, is the controlling statute with respect to the establishment of a main office by a national bank. It is my further opinion that when Congress enacted Title 12 U.S. Code Section 36(c) it did not intend any of the provisions of that Section to be incorporated in Section 30, either by implication or otherwise. In fact, I have reached the conclusion that a short answer to the argument that Section 30 cannot be applied without consideration of the provisions of Section 36(c) is that if Congress so intended it would have expressly stated that to be the fact."[17]
 
 
 20
 The District Court concluded that the hearing held, and the entire administrative proceedings, were more than adequate to afford plaintiffs due process of law, and that, consequently, a judicial trial de novo was not required.[18] Defendants' motion for summary judgment was accordingly granted and the Complaint dismissed.[19]
 
 
 21
 On this appeal, appellants claim that the District Court erred in its construction and application of Sections 30 and 36(c) (2). They contend that the simultaneous applications of PPNB are unlawful for these separate reasons: (1) the applications constitute a subterfuge for what is in reality a branching move prohibited by New Jersey statute, and therefore violate the express provisions of Section 36(c) (2); (2) the doctrine of "competitive equality," as well as recognized principles of statutory construction, require that Section 30, relating to national bank main offices, be read together with and limited by Section 36(c) (2), relating to national branch banks. Additionally, the lower court is said to have erred when it refused to conduct a trial de novo, which is mandated in this case, appellants assert, by the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment to the United States Constitution.[20]
 
 
 22
 We turn first to the question of the bona fides of the PPNB main office relocation, and the correlative issue of the applicability of Section 36(c) (2) branching restrictions.
 
 
 23
 In essence, appellants' first contention is that through the device of concurrent main office and branch applications, PPNB intends to obtain in "substance" that which New Jersey and federal branch banking statutes manifestly prohibit it from obtaining in "form:" a branch office in Wayne Township. It is further asserted that the Comptroller of the Currency, "through a formalistic approach totally ignoring substance," has participated in a "subterfuge" to circumvent applicable branching laws. Appellants assert that "in economic banking reality" the planned Wayne facility (the "main office") is a venture into a new municipality and new market area in search of new accounts, indicia common to a new branch, while the 45 year-old Prospect Park office (the "branch") continues to exist and continues to render the same services to the bulk of the bank's existing customers.
 
 
 24
 It is clear that if branching considerations were to apply in the instant case, New Jersey branching laws would govern and would preclude the proposed move to Wayne.[21] However, we are of the opinion that the Comptroller properly found that PPNB intends a bona fide move of its main office to Wayne, and we therefore conclude that Section 36(c) (2) has no applicability to the relocation here involved.
 
 
 25
 We note initially, and appellants apparently concede, that the evidence before the Comptroller affirmatively established that PPNB has complied with all of the Section 30 requirements relating to the relocation of a main office by a national bank.[22] Section 30 conditions the relocation on the granting of approval by the Comptroller. Courts have, in the main, consistently recognized the wide area of discretion delegated by Congress to the Comptroller in the complex field of national banking, and have sustained the exercise of this discretion save in those cases in which it is determined that the action taken was arbitrary, capricious, or contrary to law. See Federal Home Loan Bank Board v. Rowe, 109 U.S.App.D.C. 140, 284 F.2d 274, 278 (1960);[23] Warren Bank v. Saxon, 263 F.Supp. 34, 36-38 (E.D.Mich. 1966), aff'd, 396 F.2d 52 (6 Cir. 1968). Cf., Davis, 1 Administrative Law Treatise, § 4.04 (1965 Supp.).
 
 
 26
 The Comptroller, after a review of the extensive administrative record, specifically found that the Wayne relocation was bona fide, and in accordance with law. The Comptroller noted:
 
 
 27
 "The distinctions between a main office and a branch office are bottomed primarily on various sections of the National Bank Act and include that a national bank has but one capital structure authorized to its main office, regardless of the number of branches; that no branch of a national bank has a board of directors; that residency requirements are imposed on the directors of a national bank in relation to the main office without regard to the location of branches; that the lending limitations of a national bank are based on the capital structure of a main office without regard to the number of branches; that no branch of a national bank has separate shareholders; that a branch may be closed at any time by a bank's board of directors without approval of either the shareholders or the Comptroller; and that a main office may be closed only by liquidation, merger, or receivership, all of which are complicated processes requiring approval of the bank's shareholders and/or authorization from the Comptroller. Protestants do not contest that the office which the Prospect Park National Bank proposes to establish in Wayne will be a bona fide main office under each of these criteria."[24]
 
 
 28
 The foregoing distinctions have normally been applied by courts faced with the problem of differentiating between a "main office" and a "branch." See, e. g., Camden Trust Company v. Gidney, 112 U.S.App.D.C. 197, 301 F.2d 521, 524-525 (1962), cert. den., 369 U.S. 886, 82 S.Ct. 1158, 8 L.Ed.2d 287. The Comptroller found that each of these distinguishing characteristics was present in the relocated main office proposed by PPNB.
 
 
 29
 Moreover, prevailing economic conditions in Prospect Park, as determined by the National Bank Examiner, the Regional Administrator, and the Comptroller, supported the relocation. It was the Comptroller's conclusion, which the District Court found amply supported by the record, that:
 
 
 30
 "The applicant bank must expand and improve its physical facilities. The bank's employees and its customers are intolerably crowded, as demonstrated in the photographs the bank submitted. The applicant has received plans for enlarging and remodeling its present facilities, but such plans are extremely costly. The bank believes, and the Comptroller agrees, that the bank would not be justified in spending a substantial sum of money to enlarge its present building or to build a new building at its present location which is in a declining area."[25]
 
 
 31
 Having no place in which to expand in Prospect Park, the Comptroller considered it "only prudent" for PPNB to select a site which would permit future expansion and growth. The unchallenged evidence is that Wayne Township offers these opportunities. The history of Section 30 indicates congressional recognition that relocation applications "must naturally come from those parts of the country where population is rapidly changing or business is rapidly developing." 17 Cong.Rec. 1350 (1886).
 
 
 32
 In urging that "economic banking realities" demonstrate that the Comptroller's decision was without basis in fact, appellants rely on the fact that initially only seventeen million dollars of the ninety-two million dollars in deposits currently held in the Prospect Park office will be transferred to the Wayne facility. This, it is said, clearly proves the continued primacy of the Prospect Park office.[26] Further, appellants contend that the "service area" of the Prospect Park office is, and will continue to be, many times greater than the projected service area of the Wayne office, again indicating, they assert, that the Prospect Park office will remain, in fact if not in name, the true "main office."
 
 
 33
 In his Opinion, the Comptroller characterizes these contentions as legally and factually "frivolous."
 
 
 34
 "First, the power of a national bank to relocate with the Comptroller's approval its main office pursuant to 12 U.S.C. § 30 is in no way circumscribed by a requirement that a particular number of accounts be transferred. Second, there is no way to distinguish the main office of a bank from its branches by the number, size, or percentage of deposit accounts, or the addresses of the depositors. If plaintiffs contentions were accepted, the present main office of Prospect Park could not be its main office because only 4.2 percent of its deposit accounts belong to customers with Prospect Park addresses. Finally, even if the protestants' theory were acceptable, the record in this case shows that the Prospect Park National Bank already has more deposits generated from Wayne than from Prospect Park."[27]
 
 
 35
 We find nothing in the language or history of Section 30 which requires the Comptroller to find that the bulk of customer accounts will be relocated with the main office before he is able to grant approval.
 
 
 36
 We find equally without substance appellants' contention that the Comptroller and PPNB jointly engaged in a subterfuge to evade state branching laws. Indeed, both the actions and intentions of the defendants were quite open and apparent.[28] A similar charge of subterfuge was leveled against the Comptroller and a national bank in Merchants and Miners Bank v. Saxon.[29] There, First National Bank of Lake Linden applied to the Comptroller for permission to relocate its main office to Calumet, Michigan, and to retain its former main office in Lake Linden as a branch. Michigan law regarding the establishment of branches is substantially the same as that of New Jersey, insofar as it forbids the creation of branches in communities in which another bank is already located. In dismissing the action brought by a Calumet state bank to enjoin Comptroller approval Chief Judge Kent stated:
 
 
 37
 "Counsel for the plaintiff alleges that this is a package deal, and quite obviously that is true. The defendant bank has a semi-successful operation going in Lake Linden. It is recognized that, economically, Lake Linden is going out of existence as a commercial community. * * *
 
 
 38
 "The defendant bank, recognizing the existence of that situation, proposes to move the scene of its principal operations from Lake Linden to Calumet; but, also recognizing that it has not only a duty to its depositors and people with whom it does business, but a duty to its shareholders to maintain a profitable operation which is presently operating, and which might be in part, at least, used to absorb some of the necessary expense and problems of expansion in the new area, has formed, as part of the package, a proposal to continue a branch in Lake Linden.
 
 
 39
 "I suggest, for the purpose of the record, that any banker with the facts pending as presented to the comptroller, would deem it the height of folly to move the defendant bank to Calumet and close the Lake Linden facility.
 
 
 40
 "There is nothing in this record to establish that the defendant bank intends any portion of its applications to constitute a sham or subterfuge or fraud upon the comptroller; and certainly, as conceded by plaintiff's counsel, the comptroller has been guilty of no fraud or subterfuge, and there is no reason to charge fraud or subterfuge or any sham on the part of the comptroller. Therefore, unless otherwise prevented, the decision of the comptroller is not contrary to law."[30]
 
 
 41
 The Merchants case is on all fours with the case before us, and Chief Judge Kent's conclusions are equally applicable to the instant case.
 
 
 42
 It was conceded by plaintiff in Merchants that unless it could be shown that the concurrent applications were a sham or a subterfuge, or a fraud on the Comptroller, the Section 30 provisions were controlling on the question of whether a national bank could relocate its main office. The question of the scope of Section 30 in simultaneous main office relocation and branch retention cases had earlier been raised in the same District Court in Traverse City State Bank v. Empire National Bank, 228 F.Supp. 984 (W.D.Mich.1964). In Traverse, the defendant Empire National Bank sought to (1) become a national bank and change its name, (2) relocate its main office from the Village of Empire to Traverse City, Michigan, and (3) retain its existing Empire main office as a branch. Two Traverse City banks protested the applications, asserting that the relocation of Empire National Bank's main office into Traverse City was precluded by an earlier state court ruling that there was no "necessity" for the creation of a new banking facility in Traverse City, a prerequisite for the establishment of a new branch pursuant to Michigan law. In holding the Comptroller's approval proper as a matter of law, the District Court there stated:
 
 
 43
 "Title 12 U.S.C.A. § 30 does not oblige the Comptroller to first find `necessity' before he approves relocation of a national banking association's main office. The statute is silent on the finding of `necessity' as a condition precedent to his approval of a national bank's main office move.
 
 
 44
 "The language of the statute makes the move dependent only upon `approval' by the Comptroller and a vote of two-thirds of the shareholders of the national bank." 228 F.Supp., at 990.
 
 The Court concluded:
 
 45
 "It was apparently the intent of Congress not to limit the relocation of main offices of national banking associations by reference to state banking laws, since there is no such limitation. 12 U.S.C.A. § 30.
 
 
 46
 "If we were to hold, as plaintiffs urge us to do, we would write into Section 30 of the National Banking Act that which Congress decided not to include in the Act. This court would thus be legislating and usurping the powers of Congress." 228 F.Supp. at 992. (emphasis in the original.)
 
 
 47
 We agree with the holding in Traverse that Section 30 controls with respect to an application for a national bank's main office relocation[31] free of the impact of state banking laws or policy, and that administrative approval of such an application must be sustained if it is not arbitrary, capricious or an abuse of discretion, and it is supported by substantial evidence.[32] It is certainly not within our province to pass upon the wisdom or desirability of Section 30. That Congress has the power to exempt national banks from state regulation is unquestioned. See McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819); First Agricultural National Bank of Berkshire County v. State Tax Commission, 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968). That Congress has done so with regard to the relocation of the main offices of nationally chartered banks is equally certain, both from the lack of express language to the contrary in Section 30, and the absence of contrary suggestion in the congressional history of the National Bank Act, or Section 30 in particular.
 
 
 48
 We are aware that a contrary result was recently reached by the Seventh Circuit in Marion National Bank of Marion v. Van Buren Bank, 418 F.2d 121 (7 Cir., 1969). There the Court held there must be a conjunctive reading of Sections 30 and 36(c) with respect to an application for relocation of a national bank's main office and the conversion of its existing main office into a branch office in light of First National Bank of Logan, Utah v. Walker Bank & Trust Company, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). In our view, Walker Bank is inapposite. That case concerned only the issue of the extent to which aspects of state branching regulations were meant to apply to the creation of branches by national banks pursuant to Section 36(c). Section 30 was not before the Court nor even mentioned in its Opinion.
 
 
 49
 In support of their contention that the bona fides of a main office relocation, when joined with a branch retention, must be measured against state branching laws and policy, appellants have cited First National Bank in Plant City, Florida v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969); Bank of Dearborn v. Saxon, 244 F.Supp. 394 (E.D.Mich.1965), aff'd, 377 F.2d 496 (6 Cir. 1967); and Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Company, 116 U.S. App.D.C. 285, 323 F.2d 290 (1963), rev'd on other grounds, 379 U.S. 411, 85 S.Ct 551, 13 L.Ed.2d 386 (1965). These cases are inapposite in that each concerns some aspect of the branch banking statute, Section 36, and none deal with or refer to the main office provisions of Section 30. Additionally, each is clearly distinguishable on its facts.
 
 
 50
 Thus, we are of the opinion that branching considerations are inapplicable to the main office relocation of a national bank, and that the bona fides of the relocation is governed solely by the statutory provisions of Section 30 of the National Bank Act.[33]
 
 
 51
 We come now to appellants' alternative contention that, regardless of the bona fides of the PPNB applications, the doctrine of "competitive equality" between state and national banks requires that Section 30 be read together with and limited by the provisions of Section 36(c) (2). The essence of appellants' position is that if PPNB were a state bank, applicable New Jersey banking statutes[34] would not permit it to move its main office to Wayne and, accordingly, under the concept of competitive equality, as well as general principles of statutory construction, a national bank is not permitted to move its main office into Wayne. Appellants rely principally on the legislative history of Section 36, and First National Bank in Plant City v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969), Walker Bank and Marion Bank.
 
 
 52
 It is clear, insofar as congressional history is concerned, that nothing in the language of Section 30 or in the commentary generated by its passage in 1886, and amendment in 1959, permits the inference that state law was intended to govern the movement of national bank main offices.[35] It is equally clear that when Congress enacted Section 36(c) in 1927, and substantially amended it in 1933, nothing was said concerning the incorporation of state banking laws into Section 30.
 
 
 53
 Appellants attempt to bridge this gap by resorting to the well recognized canon of statutory construction that statutes in pari materia should be construed together. However, the language and history of the two sections are clear and unambiguous, and it is quite obvious that the sections have independent statutory scope and purpose. Thus, the statutory construction principle has no application here. Latimer v. Sears Roebuck & Co., 285 F.2d 152, 157 (5 Cir. 1960).
 
 
 54
 Similarly appellants' reliance on Walker Bank on the score of competitive equality is misplaced. Walker Bank held merely that a Utah restriction, which permitted branching only by taking over an existing bank, was binding on national banks in Utah, since the Utah provision was part of the express state law branching requirement, and Congress intended to insure "competitive equality" between state and national banks, "insofar as branch banking was concerned." 385 U.S., at 261, 87 S.Ct., at 497. It was conceded in Walker Bank that the activity in question constituted branching. The only question before the Court was the extent to which Section 36(c) adopted state law restrictions on branching. The issue here is whether Section 36(c) was intended to permit state law restrictions to govern the non-branching functions of national banks. One searches in vain for evidence of such an intention in the clear language and congressional history of Section 36(c).
 
 
 55
 Nor does the recent Supreme Court decision in Dickinson support appellants' position. The specific statutory provision before the Court in Dickinson was Section 36(f), which contains a general definition of the term "branch" for Section 36 purposes. In determining that certain off-premises services performed for customers by the First National Bank — an armored car pick-up and shopping center deposit receptacle — constituted branch banking, Mr. Chief Justice Burger stated that even in matters of branching, Congress was quite specific as to which provisions of state law were to be incorporated.
 
 
 56
 "We reject the contention made by amicus curiae National Association of Supervisors of State Banks to the effect that state law definitions of what constitutes `branch banking' must control the content of the federal definition of § 36(f). Admittedly, state law comes into play in deciding how, where, and when branch banks may be operated, Walker Bank, supra, for in § 36(c) Congress entrusted to the States the regulation of branching as Congress then conceived it. But to allow the States to define the content of the term `branch' would make them the sole judges of their own powers. Congress did not intend such an improbable result as appears from the inclusion in § 36 of a general definition of `branch.'" 396 U.S., at 133-134, 90 S.Ct., at 343. (footnote omitted.)[36]
 
 
 57
 As the foregoing indicates, the Supreme Court has been circumspect in its application of the competitive equality doctrine.
 
 
 58
 In light of the foregoing, we find without substance appellants' contention that state law restrictions must be read into the National Bank Act whenever, as in the case of main office relocations, state and national banks are arrayed in competing positions.
 
 
 59
 What has been said leaves for resolution appellants' claim that the District Court erred in refusing to consider de novo the issues of "motive" and defendants' alleged collusion. Judge Shaw, following a careful consideration of appellants' request for a de novo trial, stated:
 
 
 60
 "In conclusion, I must observe that it seems to me in the hearing before the Comptroller, together with the entire voluminous administrative record, compellingly and well established that plaintiffs were afforded a full and complete opportunity to present all of their objections. At no point in the hearing were plaintiffs deprived of an opportunity to pursue the question of whether the office to be established in Wayne was to be a bona fide office or merely a branch. No questions on this subject were cut off. A large portion of the hearing was devoted to various aspects of the question, to wit, the physical size of the Wayne office as against the Prospect Park office, percentage of deposits arising from the respective service areas and the percentage to move to the Wayne office, the number of employees of various kinds who would move to Wayne, the projection of growth for the Wayne office; and, on comparison with the facts in the cases heretofore cited,[37] it cannot be said that the Comptroller's decision was arrived at without an adversary hearing, that there was no transcript, that there were no findings or conclusions made by the Comptroller. Further, it cannot be said that he acted in a unilateral manner or that there was any effort to hide any matter from the Court or from the protestants, and, most significantly, it cannot be contended that there was no substantial evidence in support of the Prospect Park National Bank's applications.
 
 
 61
 * * * * * *
 
 
 62
 "Accordingly, I find that the hearing held, indeed the entire proceedings, were more than adequate to give plaintiffs an opportunity to protect their rights and present their arguments."[38]
 
 
 63
 Appellants dispute this. They assert that Section 10(e) (B) (6) of the Administrative Procedure Act, 5 U.S.C. § 706, requires that a trial court admit de novo evidence in all instances in which an agency hearing is not made expressly subject to the procedural requirements of Sections 7 and 8 of the Administrative Procedure Act, 5 U.S.C. §§ 556 and 557, or in which a hearing is not required by statute. Since the Comptroller is exempt from formal hearing requirements,[39] it is contended that appellants are entitled to present de novo evidence before the District Court.
 
 
 64
 We find no merit in appellants' construction of the applicable law on the standard of judicial review. We subscribe to the statement of the Court of Appeals for the Sixth Circuit in Warren Bank v. Camp, 396 F.2d 52, 54 (1968), that:
 
 
 65
 "The standard of judicial review is set by the Administrative Procedure Act. The Courts determine only whether or not the action of the administrator was `arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2) (A) (Supp. II, 1965-66). See 4 K. Davis, Administrative Law § 28.16 (1958, Supp. 1965). Thus far the District Courts have with appellate approval exercised a considerable discretion in determining the form of review required for that decision. [Citations omitted].
 
 
 66
 "There appears, however, to be general agreement that a trial de novo is not required for every complaint where abuse of administrative discretion is pled. [Citations omitted].
 
 
 67
 "Here the District Judge, limiting his review to the pleadings and affidavits filed by the parties, held that complainant had not make [sic] out a prima facie case of abuse of discretion, and hence, that no trial de novo was required.
 
 
 68
 "We agree with this conclusion."
 
 
 69
 In the instant case, as earlier detailed, Judge Shaw made extensive findings concerning the adequacy of the hearing afforded appellants and the completeness of the administrative record. He specifically found that "the Comptroller dealt at length with the issue of the alleged subterfuge and absence of good faith," and concluded that the record did not support appellants' contentions that the Comptroller's approval of PPNB's applications was "arbitrary and capricious."[40]
 
 
 70
 On review of the record, we are of the opinion that it amply supports the District Court's critical findings that the Comptroller's approval of PPNB's applications was not arbitrary, capricious or an abuse of discretion; and that such approval was bona fide, free of collusion and in compliance with the applicable provisions of Section 30, which we hold to be controlling.[41]
 
 
 71
 For the reasons stated the Order of the District Court granting defendants' motion for summary judgment against the plaintiff and plaintiff intervenor will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 24 Stat. 19 (May 1, 1886), as amended, 12 U.S.C. § 30 (1964); 44 Stat. 1228 (Feb. 25, 1927), as amended, 12 U.S.C. § 36 (1964)
 
 
 [2]
 The Commissioner was granted the right to intervene as a plaintiff in the District Court, and as an appellant in the instant appeal. The Commissioner's appeal (No. 18117) has been consolidated with that of the appellant banks (No. 18022). Also a plaintiff below was the New Jersey Bank, formerly New Jersey Bank & Trust Company, which converted to a national banking association on April 4, 1969. It is not a party to this appeal
 
 
 [3]
 PPNB maintains a branch office in Hawthorne, New Jersey. The branch office is not involved in this suit
 
 
 [4]
 The Ramapo Bank opened for business in Wayne on June 15, 1967, and had total assets of approximately $3.6 million at year-end 1967. It currently has assets in excess of $10 million. In August 1967, two months after its main office was opened, the Ramapo Bank applied to the New Jersey Commissioner for permission to establish a branch at a location less than one mile from PPNB's planned relocation site. The branch application was approved in March 1969, and the branch was opened in May 1969
 
 
 [5]
 Section 30 provides in pertinent part:
 "* * * Any national banking association, with the approval of the Comptroller of the Currency, may change the location of the main office of such association to any other location outside the limits of the city, town, or village in which it is located, but not more than thirty miles distant, by the vote of the shareholders owning two-thirds of the stock of such association. * * *"
 
 
 [6]
 Section 36(c) (2) provides the following:
 "(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: * * * (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. * * *" (emphasis supplied).
 
 
 [7]
 N.J.S.A. 17:9A-19(B) (3) contains the following language:
 "(B) No bank or savings bank shall establish or maintain a branch office which is located outside the municipality in which it maintains its principal office; except that a bank or savings bank may establish and maintain a branch office or offices anywhere in the same banking district as that in which it maintains its principal office:
 * * * * *
 "(3) when each proposed branch will be established in a municipality in which no banking institution has its principal office or a branch office; except that, when a municipality has a population of 7,500 or more, and no banking institution has its principal office therein, a bank or savings bank may establish and maintain a branch office or offices in such municipality notwithstanding the presence therein of one or more branch offices of one or more banking institutions."
 New Jersey's recent consolidation of "banking districts" does not affect the instant case. See N.J.S.A. 17:9A-19(F), L.1968, c. 415.
 
 
 [8]
 The relevant provisions of N.J.S.A. 17:9A-22 and 23 are as follows:
 "Section 22. Change of principal or branch office; application; approval
 "A. A bank or savings bank may change the location of its principal office or of a branch office to a location within the same municipality in which such principal office or such branch office is located on filing an application therefor in the department and obtaining the approval of the commissioner.
 "B. If it shall appear from the application, or if the commissioner shall find from such proof as he may require, or from such investigation as he may cause to be made, that the area which would be served by such office after its change in location would not be substantially different from the area theretofore served by such office, he shall approve the application.
 "C. If it shall appear to the commissioner, from the application, or from such proof as he may require, or from such investigation as he may cause to be made, that the proposed location will be so far removed from the place then occupied by such principal office or by such branch office that the area which would be served by such office after its change in location would be substantially different from the area theretofore served by it, he shall not approve such application unless, after such investigation or hearing, or both, as the commissioner may determine to be advisable, he shall find that the interests of the public will be served to advantage by such change in location, and that conditions in the locality to which the removal is proposed afford reasonable promise of successful operation.
 "D. No bank shall change the location of its principal office pursuant to subsection C of this section unless, following the approval of the commissioner, it shall amend its certificate of incorporation to effect such change."
 "Section 23. Interchange of principal and branch offices
 "A bank or savings bank may, without satisfying the requirements of section 22 [17:9A-22], change the location of its principal office to a location then occupied by a branch office maintained by it. After such a change, the bank or savings bank may maintain a branch office at the location formerly occupied by its principal office, or it may discontinue business at such location. Such a bank or savings bank shall file a certificate of such change in the department within one week from the date such change is made. A change in location effected pursuant to this section shall not be subject to the limitations imposed by subsection C or D of section 19 [17:9A-19]."
 
 
 [9]
 It should be said that a bank may establish a branch in Wayne through merger. Both the New Jersey Bank and the First National Bank of Passaic County gained entry into Wayne by merger with existing institutions
 
 
 [10]
 Broadway Bank & Trust Company is a state bank located in Paterson, New Jersey. It has no offices in Wayne. An additional protest, filed by the People's Trust Company of Bergen County, was withdrawn on July 26, 1968
 
 
 [11]
 Neither recommendation considered the legal challenge pressed by the protestant banks and the New Jersey Commissioner. The National Bank Examiner's Report regarding the proposed main office move recommended the application "be approved, providing current laws entitle [PPNB] to do so." Report of Investigation of Anthony Petrshin, Jr., June 20-21, 1969. Similarly, in a letter to counsel for the Ramapo Bank dated September 19, 1968, the Deputy Comptroller of the Currency indicated his unwillingness to take up the question of the legality of the PPNB applications at that time
 
 
 [12]
 "Opinion of the Comptroller of the Currency on the Applications of the Prospect Park National Bank for Permission to Change the Location of its Main Office from 124 Haledon Avenue, Prospect Park, New Jersey, to Hamburg Turnpike and Duncan Lane, Wayne, New Jersey, and to Retain Its Former Main Office as a Branch", dated April 8, 1969, p. 6. Hereinafter "Opinion of the Comptroller."
 
 
 [13]
 The New Jersey Commissioner of Banking and Insurance was granted permission to intervene on May 9, 1969
 
 
 [14]
 Complaint filed in the United States District Court for the District of New Jersey, at Civil Action No. 423-69, dated April 9, 1969
 
 
 [15]
 Unreported Opinion of Shaw, J., Civil Action No. 423-69, D.N.J., May 19, 1969, p. 28
 
 
 [16]
 Id., p. 27.
 
 
 [17]
 Id., p. 18.
 
 
 [18]
 Id., p. 28.
 
 
 [19]
 Order of Shaw, J., Civil Action No. 423-69, D.N.J., May 20, 1969. Judge Shaw further denied plaintiffs' application for stay pending appeal. Unreported Opinion of Shaw, J., op. cit., pp. 37-39. A motion for stay pending appeal, filed in this Court on July 9, 1969, was denied in an Order dated July 15, 1969. We have been advised by counsel for PPNB that the bank has proceeded with its plans, and will commence operations in Wayne in a temporary facility before the end of 1969
 
 
 [20]
 In addition, appellants contend that the District Court erred when it ruled that the "motivation" behind PPNB's relocation and branch retention was irrelevant to the issue of thebona fides of the applications, and when it found that the Comptroller's decision was supported by substantial evidence. These contentions are disposed of in our disposition.
 
 
 [21]
 The United States Supreme Court recently reaffirmed the principle that: "One such condition [under which national banks may establish branches] is that a `branch' may be established only when, where, and how state law would authorize a state bank to establish and operate such a branch, 12 U.S.C. § 36(c). First National Bank of Logan, Utah v. Walker Bank & Trust Company, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966)." First National Bank in Plant City, Florida v. Dickinson, 396 U.S. 122, 130, 90 S.Ct. 337, 341, 24 L.Ed.2d 312 (1969). Footnote omitted. We noted earlier that New Jersey branching laws would not permit PPNB to establish abranch bank in Wayne in the context of this case. See, supra, n. 7.
 
 
 [22]
 As stated above, Section 30, the provision of the National Bank Act governing main office relocations, requires that the relocated office (1) be within 30 miles of the former main office, (2) that it be approved by a two-thirds vote of the shareholders, and (3) that it have the approval of the Comptroller of the Currency. See,supra, n. 5.
 
 
 [23]
 InRowe, the Court stated:
 "An examination of congressional legislation with regard to banking since 1864 shows that Congress has consistently used various forms of the word `approve' in the sense of conferring discretion upon the Comptroller of the Currency, the Secretary of the Treasury, or the Federal Reserve Board." 284 F.2d, at 278.
 
 
 [24]
 Opinion of Comptroller,supra, p. 8.
 
 
 [25]
 Id., p. 2.
 
 
 [26]
 Support for this position is said to come from Bank of Dearborn v. Saxon, 244 F. Supp. 394 (E.D.Mich.1965), aff'd, 377 F. 2d 496 (6 Cir. 1967). The District Court there said that abranch office "move" included, as a minimum, "taking the bulk of the customer's accounts along." 244 F. Supp., at 397. No authority for this principle is cited by the Dearborn Court, and there is nothing contained in either Section 30 or 36 to require that such a finding be made as a matter of law.
 
 
 [27]
 Opinion of the Comptroller,supra, pp. 7-8.
 
 
 [28]
 In claiming that there is evidence of collusion between the Comptroller and PPNB, appellants point to several "ex parte communications" PPNB allegedly engaged in with members of the Comptroller's Regional Office. Commenting on this charge, Judge Shaw noted that while "there may be impropriety in this type of approach to a public agency," if the communications did in fact occur, such practice was customary between individuals and agencies in the area of regulated industries.
 
 
 [29]
 Unreported Opinion of Kent, C. J., No. 1042, W.D.Mich., N.D., July 13, 1966
 
 
 [30]
 Opinion of Kent, C. J.,supra, pp. 8-10. See also, Camden Trust Company v. Gidney, 112 U.S.App.D.C. 197, 301 F.2d 521, 523 (1962), cert. den., 369 U.S. 886, 82 S.Ct. 1158, 8 L.Ed.2d 287. We note that appellants in the instant case do charge fraud on the part of the Comptroller. We find this allegation wholly without substance. As Judge Shaw found in the court below, everything done by defendants was as open and obvious as was practically possible. Opinion of Shaw, J., supra, p. 23.
 
 
 [31]
 Appellants concede that if the relocation of PPNB's main office is lawful, there is no legal impediment to PPNB's retaining, or creating, a branch office in Prospect Park
 
 
 [32]
 See Community National Bank of Pontiac v. Saxon, 310 F.2d 224, 226 (6 Cir. 1962): "the decisions of executive officers on questions of fact are conclusive if reasonably supported by substantial evidence."
 
 
 [33]
 It is noted that the Comptroller contends that once we have determined that the planned PPNB relocation isbona fide and in accordance with Section 30, appellants no longer have standing to sue, since their suit becomes one merely to be free from what we have decided is the lawful competition of a national bank. It must first be said in reply to the Comptroller's jurisdictional challenge that insofar as appellants claim to be aggrieved by the arbitrary, capricious, and statutorily unauthorized action of the Comptroller, we have jurisdiction to entertain this suit pursuant to the Administrative Procedure Act, 5 U.S.C. § 702. See Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 157, 90 S.Ct. 827, 832, 25 L.Ed.2d 184 [1970]:
 "We find no evidence that Congress in either the Bank Service Corporation Act or the National Bank Act sought to preclude judicial review of administrative rulings by the Comptroller as to the legitimate scope of activities available to national banks under those statutes. Both Acts are clearly `relevant' statutes within the meaning of § 702."
 Moreover, this Court has jurisdiction of the subject matter of the instant suit pursuant to 28 U.S.C. § 1331(a), inasmuch as appellants' contentions arise under a federal statute, the National Bank Act, 12 U.S.C. §§ 30 and 36(c) (2). See Gully v. First National Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936); Suburban Trust Co. v. National Bank of Westfield, 211 F.Supp. 694, 698 (D.N.J.1962); Investment Company Institute v. Camp, 274 F.Supp. 624, 636-638 (D.D.C.1967).
 
 
 [34]
 The New Jersey statutes referred to by appellants are N.J.S.A. 17:9A-22 and 23. See,supra, n. 8. It is not clear from the face of these sections that a state bank would be precluded from entering Wayne by moving its principal office. The New Jersey Commissioner of Banking and Insurance assures us that such is the intent of the provisions. Our disposition of appellants' contention, however, makes unnecessary the resolution of this issue.
 
 
 [35]
 In 1959, Section 30 was amended to require Comptroller approval before a national bank could change the location of its main officewithin the limitations of the city, town or village in which it is situated. Pub.L. 86-230, § 3, 73 Stat. 457 (September 8, 1959). Prior to the enactment of Section 30 in 1886, a national bank, which was chartered by Congress, could only change its place of business by a special act of that body. Section 30 represented an attempt by Congress to relieve itself of that burden. See House Debates, 49th Congress, First Sess., 17 Cong.Rec. 1349 (1886). There is no evidence of any other congressional purpose ever having been voiced with respect to Section 30. Nor is there evidence of an intention on the part of Congress to make "competitive equality" the overriding policy of the National Bank Act.
 
 
 [36]
 See also, Howell v. Citizens First National Bank of Ridgewood, 385 F.2d 528, 530 (3 Cir. 1967)
 
 
 [37]
 Citizens Bank of Hattiesburg v. Camp, 387 F.2d 375 (5 Cir. 1967), cert. den., 391 U.S. 904, 88 S.Ct. 1652, 20 L.Ed.2d 418 (1968); Peoples Bank of Trenton v. Saxon, 373 F.2d 185 (6 Cir. 1967); Bank of Haw River v. Saxon, 257 F.Supp. 74 (M.D.N.C.1966)
 
 
 [38]
 Opinion of Shaw, J.,supra, pp. 36-37.
 
 
 [39]
 See, e. g., First National Bank of Smithfield, North Carolina v. Saxon, 352 F.2d 267 (4 Cir. 1969); First-Citizens Bank & Trust Co. v. Camp, 409 F.2d 1086 (4 Cir. 1969); Davis, 1 Administrative Law Treatise, § 4.04 (1965 Supp.)
 
 
 [40]
 Appellants' reliance on Bank of Haw River v. Saxon, 257 F.Supp. 74 (M.D. N.C.1966), is misplaced. The District Court there found: "It is perfectly evident that the Comptroller was attempting to do nothing more than placate the plaintiff, and indeed the Court, by trying to make his action resemble some type of hearing. Never has the Comptroller revealed to the plaintiff or the Court the evidence before him at the time he made his decision, and he gives no plausible or rational reason as to why he deleted or blocked out important parts of his administrative file before certifying it to the Court." 257 F.Supp., at 79
 
 
 [41]
 On the score of the contention of the New Jersey Commissioner of Banking and Insurance that there is an "unfair" result in allowing PPNB to move its main office in accordance with Section 30 and still retain its former main office as a branch we must note that N.J.S.A. 17:9A-19(B) (3), relating to branch offices, does not now provide that a bank which moves its principal office outside the municipality cannot retain its former principal office as a branch."