Bill Grant, General Counsel State Banking Department 700 Jackson, Suite 300 Topeka, Kansas 66603
Dear Mr. Grant:
As general counsel for the Kansas banking department, you have requested our opinion regarding the following two questions:
 "1. If a national banking association relocates its main office from Kansas to another state pursuant to 12 U.S.C. § 30(b), does continued operation by the association of its Kansas locations as branches of the out of state association violate K.S.A. 9-813 and/or 12 U.S.C. § 36?
 "2. Is the relocation of the main office of a national banking association from another state into Kansas, pursuant to 12 U.S.C. § 30(b), subject to the Kansas Bank Holding Company Act (KBHCA) found at K.S.A. 9-519 through K.S.A. 9-524 and K.S.A. 9-532
through K.S.A. 9-539?"
You acknowledge that a national bank can relocate its main office from Kansas to another state pursuant to 12 U.S.C. § 30. You have informed us that this move complies with the 30 mile requirement of 12 U.S.C. § 30. Therefore, the question centers around what happens to the branches that are located in Kansas once the national bank relocates its main office to Missouri.
12 U.S.C. § 36 states:
 "(b)(1) A national bank resulting from the conversion of a State bank may retain and operate as a branch any office which was a branch of the State bank immediately prior to conversion if such office:
 "(A) might be established under subsection (c) of this section as a new branch of the resulting national bank, and is approved by the Comptroller of the Currency for continued operation as a branch of the resulting national bank;
"(B) was a branch of any bank on February 25, 1927; or
 "(C) is approved by the Comptroller of the Currency for continued operation as a branch of the resulting national bank.
 "The Comptroller of the Currency may not grant approval under clause (C) of this paragraph if a State bank (in a situation identical to that of the national bank) resulting from the conversion of a national bank would be prohibited by the law of such State from retaining and operating as a branch an identically situated office which was a branch of the national bank immediately prior to conversion.
 (2) A national bank (referred to in this paragraph as the `resulting bank'), resulting from the consolidation of a national bank (referred to in this paragraph as the `national bank') under whose charter the consolidation is effected with another bank or banks, may retain and operate as a branch any office which, immediately prior to such consolidation, was in operation as:
 "(A) a main office or branch office of any bank (other than the national bank) participating in the consolidation if, under subsection (c) of this section, it might be established as a new branch of the resulting bank, and if the Comptroller of the Currency approves of its continued operation after the consolidation;
 "(B) a branch of any bank participating in the consolidation, and which, on February 25, 1927, was in operation as a branch of any bank; or
 "(C) a branch of the national bank and which, on February 25, 1927, was not in operation as a branch of any bank, if the Comptroller of the Currency approves of its continued operation after the consolidation.
 "The Comptroller of the Currency may not grant approval under clause (C) of this paragraph if a State bank (in a situation identical to that of the resulting national bank) resulting from the consolidation into a State bank of another bank or banks would be prohibited by the law of such State from retaining and operating as a branch an identically situated office which was a branch of the State bank immediately prior to consolidation.
 "(3) As used in this subsection, the term "consolidation' includes a merger.
 "(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. . . ."
It should be pointed out that this question arises due to an OCC opinion issued on January 10, 1994, regarding the application of First Fidelity Bank, national association, Philadelphia, Pennsylvania and First Fidelity Bank, national association, Newark, New Jersey. In their decision, the OCC opined that the two banks could consolidate and retain their branches after the relocation of the main office across state lines.
In analyzing a statute, the plain language normally controls. However, in this case, even the OCC acknowledges that:
 "Neither section 30 nor section 36 expressly addresses the subject of the continuation of existing branches when the main office relocates. Moreover, the legislative history of the statutes similarly does not address this question directly. Section 30 sets forth the requirements for the relocation of the main office, but it does not expressly address the treatment of existing branches. Section 36 sets forth rules regarding branching by national banks in various circumstances, but it too does not address the treatment of existing branches in a main office relocation." First Fidelity, pp. 32-33.
Therefore, we are left in a position of determining legislative intent.
 "In order to interpret the statute, the court must try to ascertain as best it can that amorphous and ethereal concept known as legislative intent. See State v. Hill, 189 Kan. 403, 369 P.2d 365, 370 (1962) (fundamental rule of statutory construction is to ascertain lawmakers' intent in order that the legislature's true meaning may be determined); see also Connecticut national Bank v. Germain, ___ U.S. ___, ___, 12 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (canons of construction help courts determine the meaning of legislation). In determining legislative intent, we are not limited to consideration of the language used in the statute, but may also consider the historical background of the statute, the circumstances attending its passage, the purpose it was to accomplish, and the effect the statute may have under various constructions suggested. Steele v. City of Wichita, 250 Kan. 524, 826 P.2d 1380, 1385 (1992). We may also consider the causes which impel the statute's adoption. Marl Sales Co. v. Critiques, Inc., 796 F.2d 1293, 1297 (10th Cir. 1986) (citing Petition of City of Moran, 238 Kan. 513, 713 P.2d 451, 456
(1986); Hughes v. Inland Container Corp., 247 Kan. 407, 799 P.2d 1011, 1017 (1990).
. . . .
 "The Kansas rules of statutory construction provide that a statute is not to be arbitrarily construed according to its strict letter, but must be given a construction that will advance the sense and meaning fairly deducible from the context. See Mahone v. Mahone, 213 Kan. 346, 517 P.2d 131, 134 (1973); Mendenhall v. Roberts, 17 Kan. App. 2d 34, 831 P.2d 568, 574, rev. denied, 17 Kan. App. 2d 34, 831 P.2d 568
(1992)." Koch v. Shell Oil Co., 820 F. Supp. 1336, 1340, 1341 (D.Kan. 1993).
The OCC explained the purpose of the various sections of 12 U.S.C. § 36
in the following manner:
 "Section 36(a) authorizes national banks to retain those branches that they had at the time of the enactment of the McFadden Act ("grandfathered branches") even if such branches could not be established anew under the new provisions of McFadden. Section 36(b) governs the retention of branches by a national bank that results from the conversion of a state bank (paragraph 36(b)(1)) or from the merger or consolidation of state or national banks into a national bank (paragraph 36(b)(2)). It also contains provisions regarding grandfathered branches for such banks. See 12 U.S.C. § 36 (b)(1)(B) and 36 (b)(2)(B). Section 36(c) applies only to the establishment and operation of new branches by national banks." First Fidelity, p. 33.
The OCC also discussed in their opinion the view that section 30 controls the operation of existing branches and that section 36 controls the establishment of new branches.
 "The issue here is the interpretation of section 30 and section 36 with respect to the continuation of existing branches when the main office relocates. After reviewing the statutes, legislative history, and cases, we conclude that the continued operation of existing branches is contemplated by section 30 without regard to section 36, but that establishment of new branches
by the relocated bank thereafter is subject to section 36. Accordingly, First Fidelity-Pennsylvania is authorized to continue to operate its existing branches in Pennsylvania and New Jersey only under section 36." First Fidelity, p. 32.
The OCC concluded:
 "When it originally enacted the main office location provision in 1886, Congress authorized national banks to relocate their main offices while permitting them to retain any existing branches. Throughout the subsequent development of more detailed branching provisions in section 36, Congress has never indicated any intention to bring branch retention in main office relations within the scope of section 36; rather the continuation of existing branches by the relocating bank is left within section 30. The OCC and the courts have interpreted section 30 to operate independently of the McFadden Act. Congress, in subsequent development of section 30, has shown no intent to alter its independence from section 36.
. . . .
 "In the absence of express statutory language in section 36(c) addressing the situation or of clear congressional intent that such divestiture is required, we are loathe to interpret the statutes in this matter. Unlike limitations on a bank's ability to establish new branches, this interpretation would require the bank to lose branches it already lawfully has established and is operating. Such an imposition requires direct statutory language and clear congressional intent. Even statutes that expressly affect established property or contract rights are strictly construed. See, e.g., Farmers Mechanics National Bank of Buffalo v. Dearing, 91 U.S. 29, 33, 35-36
(1875); Checkrite Petroleum, Inc. v. Amoco Oil Co., 678 F.2d 5, 8-10 (2d Cir. 1982). See generally 3A Sutherland Statutes and Statutory Construction sec. 67.01 (5th ed. 1992). Thus, it requires an unmistakable showing of legislative intent to find such an effect in a statute only by implication. As explained above, there is no such direct expression here." First Fidelity, p. 44.
The court in Ramapo Bank v. Camp, 425 F.2d 333 (1970), held that a national bank could move its main office to another city and retain the former main office as a branch. The Ramapo case cited the unpublished opinion of Kent, C.J., No. 1042, W.D. Mich., N.D., July 13, 1966, which involved the relocation of a main office and the retention of the former main office as a branch. The judge in this case stated, "I suggest, for the purpose of the record, that any banker with the facts pending as presented to the comptroller, would deem it the height of folly to move the defendant bank to Calumet and close the Lake Linden facility."
The tenth circuit in Colorado State Banking Board v. Resolution TrustCorporation, 926 F.2d 931 (10th Cir. 1991), has held that the standard of review of an agency interpretation has been established by the case ofChevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,467 U.S. 837, 842-843, 104 S.Ct. 2778, reh'g denied, 468 U.S. 1227,105 S.Ct. 28 (1984).
 "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."
Furthermore,
 "[c]ourts have, in the main, consistently recognized the wide area of discretion delegated by Congress to the Comptroller in the complex field of national banking, and have sustained the exercise of this discretion save in those cases in which it is determined that the action taken was arbitrary, capricious, or contrary to law." Ramapo, p. 341.
We are thus obliged to follow the OCC decision in the First Fidelity application. Based on that decision, section 30 is the controlling section and existing branches should be allowed to be retained when the main office of national banking association is relocated to another state.
It has been argued that K.S.A. 9-813 would prohibit the retention of the branches once the main office relocates to another state.
 "(a) No bank the home office of which is outside the state of Kansas shall establish or operate a branch bank within the state of Kansas. . . ."
Section 30 has been determined to be interpreted without the necessity of taking into account state laws on the matter. Ramapo, p. 344; TraverseCity State Bank v. Empire National Bank, 228 F. Supp. 964 (1964). However, even if we accept that the retention of branches is controlled by section 36, the effect of K.S.A. 9-813 would run afoul of the commerce clause found in United States Constitution, art. 1, sec. 8.
 "Although the Clause thus speaks in terms of powers bestowed upon Congress, the court long has recognized that it also limits the power of the States to erect barriers against interstate trade. [Citations omitted]. This limitation upon state power, of course, is by no means absolute. In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of "legitimate local concern," even though interstate commerce may be affected. [Citations omitted]. Where such legitimate local interests are implicated, defining the appropriate scope for state regulation is often a matter of `delicate adjustment.' [Citations omitted]. Yet even in regulating to protect local interests, the States generally must act in a manner consistent with the `ultimate . . . principle that one state in its dealings with another may not place itself in a position of economic isolation." [Citations omitted]. However important the state interest at hand, `it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently.' [Citations omitted]. Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." Lewis v. B.T. Investment Managers, Inc., 100 S.Ct. 2009 (1980).
In McEnteer v. Clarke, 644 F. Supp. 290, 293, 294 (E.D.Pa. 1986) the court reviewed a Pennsylvania statute which was similar to K.S.A. 9-813
and determined that "the practical effect of the Pennsylvania statute is not necessitated by legitimate local concerns which outweigh the values protected by the commerce clause. Plaintiff has shown nothing but an effort to protect local banks from competition."
Therefore, under this analysis, we opine that K.S.A. 9-813 cannot be used to prevent national banks from engaging in this activity but could be used to prevent out-of-state state banks from establishing a branch bank in Kansas.
Your second question is whether "the relocation of the main office of a national banking association from another state into Kansas, pursuant to12 U.S.C. § 30(b), subject to the Kansas Bank Holding Company Act (KBHCA) found at K.S.A. 9-519 through 9-524 and K.S.A. 9-532 through K.S.A. 9-539?" More specifically you ask, "is the relocation subject to state banking board approval pursuant to KBHCA?"
K.S.A. 9-532 states in pertinent part:
 "[A] bank holding company located in a state contiguous to this state or in the state of Arkansas or Iowa, with approval of the state banking board, may acquire, directly or indirectly, ownership or control of, or power to vote, any of the voting shares of, an interest in, or all or substantially all of the assets of a bank having its principal place of business located in this state or of a bank holding company located in this state."
The Traverse court discussed the role of a state banking department on the relocation of the main office pursuant to section 30 and held that although Michigan statutes required a state bank that converted to a national charter to still fall within the scope of the state statutes that the "statute cannot be interpreted so as to supersede or interfere with the administrative control or powers of the comptroller of the currency over national banks as provided in the National Banking Acts."Traverse, p. 989.
The court also stated that:
 "[W]hen defendant bank was fully converted from a state banking association to a national banking association, it ceased to be subject to state banking laws and the state banking commissioner insofar as they relate to the administration of the defendant as a banking association.
. . . .
 "The language of the statute [12 U.S.C.A. sec. 30] makes the move dependent only upon the `approval' by the Comptroller and a vote of two-thirds of the shareholders of the national bank." Traverse, p. 989-90.
The court in Ramapo and McEnteer reiterated this position by stating that "section 30 controls with respect to an application for a national bank's main office relocation free of the impact of state banking laws or policy." Ramapo, p. 344; McEnteer, p. 293. The court in Marion NationalBank of Marion v. Van Buren Bank, 418 F.2d 121, 123 (1969), held that "relocation of a national bank is permitted in certain circumstances, and with the approval of the comptroller, by 12 U.S.C. § 30. The propriety of the move is not made to depend on state law."
Based on these cases, we opine that if an out-of-state national bank relocates it's main office pursuant to 12 U.S.C. § 30, it does not have to seek the approval of the state banking board.
In conclusion, it is our opinion that once a national bank relocates its main office from Kansas to another state pursuant to 12 U.S.C. § 30, the national bank may retain the branches located in Kansas. Furthermore, the national bank does not have to seek the state banking board's approval when it relocates its main office from another state to Kansas.
Very truly yours,
 ROBERT T. STEPHAN Attorney General of Kansas
 Mary Jane Stattelman Assistant Attorney General
RTS:JLM:MJS:bas